Hulan Boyd WRIGHT, Appellant,

v.

The STATE of Texas, Appellee.

No. 61944.

Court of Criminal Appeals of Texas, Panel No. 3.

Dec. 10, 1980.

Rehearing Denied Jan. 21, 1981.

William A. Bratton, III, Dallas, for appellant.

Henry Wade, Dist. Atty., Steve Wilensky, Mary K. Ludwick and Robert E. Whaley, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

Before ROBERTS, TOM G. DAVIS and W. C. DAVIS, JJ.

## OPINION

W. C. DAVIS, Judge.

This is an appeal from a conviction for unauthorized use of a vehicle. Sec. 31.07, V.T.C.A. Penal Code. The appellant pled guilty to the offense, and the jury assessed his punishment at four years confinement.

Briefly, the evidence adduced at trial on September 18, 1978, is as follows: Don Hagan testified that a 1978 Pontiac Trans Am was missing from his car lot; James Roberts, a night attendant at a gas station testified that at 2:40 a. m. on July 28, 1978, a car drove into the station "at a great speed and made a U-turn and come (sic) around the outside pumps; Roberts testified that the lights were not on at the pumps; but that the lights were on in the office. The attendant became suspicious, so he got a gun and started to walk toward the car. Before the attendant could get close enough to the car to see the driver, the car drove off. The attendant saw a police car follow the car. Police Officer Duesman testified that he saw a car pull out of the gas station at a fast rate of speed and he followed the car. When the officer turned on his red lights, the car did not stop, but continued, running through red lights and stop signs. The car turned down a dead end street and into an alley, where it stopped. The officer cautiously approached the car and he saw two hands suddenly come up from inside the car. He heard the appellant shout, "Don't shoot, don't shoot. I have a gun." The appellant was arrested and searched. Two guns were found in the car.[1] The next witnesses, four police officers, testified that the appellant's reputation was bad. The appellant also testified to his version of that night's events. The appellant pled guilty to the offense before the jury; thus, the issue at the trial was the punishment to be assessed.

In ground of error number one, the appellant complains that he was harmed by improper reputation testimony. The record reflects that the appellant grew up in Dallas. Ostensibly to prove the appellant's reputation in that community, the State called a highway patrolman from San Antonio, who patrolled in Bexar County. Patrolman Ralph Gonzales testified that he met the appellant on July 12, 1978, and that he knew the appellant's general reputation for being a peaceful and law abiding person was bad. On cross-examination, defense counsel asked Gonzales:

"BY MR. BRATTON:

Q. Mr. Gonzales, have you ever been employed here in Dallas?

A. I never have.

Q. You have worked exclusively down in Bexar County?

A. Yes, that is correct.

Q. Who do you know, other than yourself, that knows Hulan Boyd Wright, can you name some names for me?

---

1. The State continually attempted to bring into evidence that the two guns found in the appellant's possession were stolen. Twice during the trial, hearings were held outside the presence of the jury, wherein the trial court ruled that the State could not show that appellant had stolen the guns, on the grounds that the theft was an extraneous offense.

A. Other than myself, just the DA's office and the people I have talked to with the DA's office.

Q. These people over here?

A. Yes.

Q. They informed you what his reputation is or how did you hear about it?

A. I have spoken to them about it and I stopped him back in July.

Q. All right. But I'm asking you, do you know anyone other than these District Attorneys here that know Hulan Boyd Wright?

A. No, I don't."

The appellant moved to strike the witness' testimony. The motion was granted by the trial court and the jury was instructed to disregard the testimony. The appellant's motion for a mistrial was denied.

We agree that the "reputation" evidence elicited from Patrolman Gonzales was improper, and find that the trial court correctly granted the appellant's motion to strike the testimony. See *Mitchell v. State*, 524 S.W.2d 510 (Tex.Cr.App.1975). In *Mitchell v. State*, supra, the Court held that the admission of improper reputation testimony into evidence was harmless error, stating:

"We have concluded, however, that the error in permitting the witness to testify was harmless. Waits' testimony was extremely terse, without embellishment. Moreover, the record shows that he was followed at the punishment phase by three other witnesses from law enforcement agencies in or near Johnson County who gave, without objection, testimony identical to that of Chief Waits. We conclude that the effect of Waits' testimony was harmless beyond a reasonable doubt."

In this case, as in *Mitchell*, supra, three other reputation witnesses were called and each officer offered testimony identical to that of the San Antonio officer. However, in this case, we do not find that the error was harmless. Despite the ruling of the trial court, striking the improper testimony, the State revived the improper evidence before the jury at final argument. The State argued:

"[MR. WHALEY]: You, the people of Dallas County. He is talking about reputation. He says these *reputation witnesses* are a bunch of people all talking about gossip. Well, you had a police officer in here from Dallas that said he has known the man since 1969 and his reputation is bad. You had a police officer come in from Mesquite and said he has known him since 1974 and his reputation is bad. You had another police officer come in and say he met him on July 14, 1978 and his reputation is bad. I didn't hear Mr. Bratton say, you are picking on this poor retarded boy, why don't you come in and explain it to us why you say that? Did you hear that? No, no, no. No, he just said no question. Let's get that man off of the stand. Well, that ought to tell you something. He did bring up—*we talked with the State Trooper* and he accused us in a backhanded way, in a kind of what we would call a cheapshot, I think, that Ms. Ludwick—

[MR. BRATTON]: Your Honor, I object to his statement as being striking the Defendant over the shoulders of counsel at this point.

[MR. WHALEY] [Prosecutor]: All right. I will retract that to say this, Judge—

\*　　\*　　\*　　\*　　\*　　\*

He did say to you that when the State Trooper was called up here from San Antonio that Ms. Ludwick did it—like we just pulled somebody out of San Antonio and told them to come up here and say the.man's reputation is bad but that same man told you that he knew him and he met him in San Antonio, not in Dallas, and there were no questions beyond that so you can think about that for a minute. You can put all of these things together ..." (Emphasis added)

The appellant's counsel did not object to these last quoted statements by the prosecutor and appellant's counsel did refer briefly to the testimony of the San Antonio

patrolman during his closing argument;[2] however, the prosecutor's argument cannot be classified as an invited response to appellant's argument. We find that the remarks were blatantly improper and further compounded the harm which occurred when the evidence was first presented to the jury.

The appellant next contends that the trial court erred in overruling his objection to the prosecutor arguing outside the record. The specific portion of the argument about which the appellant complains is as follows:

"[MR. WHALEY]: You say, well, a man couldn't be bad or he couldn't have a bad reputation or he couldn't be someone dangerous in the community unless you have got prior convictions on him—

[MR. BRATTON]: Your Honor, I object to that.

[MR. WHALEY]: —if that were true.

[Appellant's objection overruled]

[MR. WHALEY]: With that kind of thinking, with that kind of logic—and Mr. Bratton brought this up—*what would you say at the trial of Jack the Ripper or the Boston Strangler, the friendly rapist, they didn't have any prior convictions on them—*" (Emphasis added)

The appellant's objection to this argument was overruled.

The appellant contends that the argument injected new and harmful facts before the jury. The State contends that the argument was a proper plea for law enforcement. We find that the argument was improper; however, we do not pause at this time to determine if the error was so harmful as to require reversal, for upon our consideration of the record, we find that the arguments from the State evince a course of conduct by the prosecutors which could serve no purpose other than to inflame and prejudice the minds of the jurors.

2. Defense Counsel argued:
   "The law says you have to try the man on what evidence is legally presented to you; just as I told you on Voir Dire that reputation could be proved through gossip. One man got up here and said that his gossip came from the DA's Office as to tell you that his

In its vehement argument to the jury against a probated sentence for the appellant, the State argued:

"[MS. LUDWICK]: Then around 5:00 in the afternoon, you know he is hanging around the clubroom of the Foxfire Apartments, where he does not live. As a matter of fact, the guy who lives in the Foxfire Apartments, who is a friend of his friend who is a bad influence, he doesn't even know his name. *So he is hanging around the clubhouse and all of a sudden, he comes into the possession of a handgun and a rifle out of a closet of the clubroom*[3] and he puts them in his car that he has stolen earlier in the day.

\* \* \* \* \* \*

Then he said that he kept the pistol in his lap and the rifle in the trunk for protection. Who are you going to protect yourself from, remember that? He couldn't think of a single soul. He couldn't think of a single reason he needed protection and *I will tell you later why he kept that pistol in his lap, he didn't need it for protection, he needed it for some other reason, a much better one.*

[Appellant's objection overruled]

\* \* \* \* \* \*

*I'm going to tell you the theory that the District Attorney's Office has about what happened on July 27th and the early morning hours of July 28th,* based upon the evidence that you have heard in this Courtroom. First of all, this man went out to Lone Star Dodge and he stole a car. I will submit to you it is a reasonable deduction from the evidence that his bags were packed in the trunk of that car because he intended to leave town with that stolen car, he had no money, he had no credit cards, how far are you going to get on one tank of gas in a stolen car with no money? *He goes over to the*

reputation was bad because the DA's Office told him it was bad. Now, they are getting up here and trying to draw all of these conclusions about something. He took a car, that is what he did."

3. See footnote 1.

*Foxfire Apartments and he gets himself two guns, two loaded guns.* He drives around and he waits until midnight and he goes into an all night gas station and he pulls up in the far side—the farthest pumps and he has got the pistol in his lap, he has not got a red cent on him, he has got three-quarters of a tank of gas and he does not need any gasoline and there is nothing that he can buy for nothing in Dallas so why do you think he is in the gas station? *I'm going to submit to you that it is a reasonable deduction from the evidence that when that attendant came out to pump that gas for him he was going to rob him,* that is why he had the gun and the only reason that he didn't rob him was because when James Roberts saw how he was acting out there, he pulled his own gun out of that drawer and he came out to check him out and this man decided it is a lot easier to rob somebody who is not armed than somebody who is and he hauled out ...[4]

\* \* \* \* \* \*

I will submit to you that someone needs to get his attention in a big way because had it not been for good police work and a service station attendant who was suspicious enough to arm himself, we would have had a very, very sad thing happen in the early morning hours of July 28th and it was almost coincidence that stopped it.

\* \* \* \* \* \*

[MR. WHALEY]: ... Now, the District Attorney's Office, under Mr. Henry Wade, however, many years Henry had been here, have been victim oriented and we care about—
[Appellant's objection overruled]

\* \* \* \* \* \*

He [appellant] was lying in the front seat of the car in a hidden position with a police officer standing behind him and he couldn't see him, and he had his gun—this loaded gun in his lap, was in there lying down in the front seat, in a remote spot and a police officer would have walked up to that car door and looked in it and what would have happened? Well, we will never know because the police officer being a well trained experienced man, he stood behind that car and shined his light in there and that way that didn't give him [appellant] a prayer...

\* \* \* \* \* \*

Well, the only thing he did is he went out and stole a very expensive automobile. I don't know what a seven or eight thousand dollar automobile, he planned it. Well, it was a scheme, he did it and he got away with it, there was no problem. Thereafter, he elected to arm himself with this gun and he carried it with him in his lap. What were his intents beyond that? I don't know. What did he intend, you can reason—you can guess or you can figure it out for yourself. What would you—try it, a man drives in at 2:40 in the morning, into a gas, an all night gas station that is open, pulls up to a pump, he acts so suspiciously that the man who is running the gas station arms himself and runs out, he doesn't have any money, he didn't need any gas, he had a gun and it is a loaded gun in his lap. What do you think he was going to do? *That is the offense.*

\* \* \* \* \* \*

... he kept that gun in his lap to protect himself. Ms. Ludwick pointed out to you from who? Well, if he drove around in a stolen car with loaded gun in his lap, I submit to you that *he planned to protect himself from our Dallas policeman because they would be looking for that car and if they stopped him and if he got an opportunity in some remote place to kill that policeman and drive off.* I submit to you that that is exactly what he had in mind with that loaded gun... Ladies and Gentlemen, we do not need to subject

---

4. Of course, these assertions are totally outside the record. The only evidence pertaining to appellant's purpose at the gas station came from appellant's own testimony. The appellant testified that he wanted to see if any of his friends were at the Jack in the Box, which was shown to be next to the gas station. The appellant drove into the station, saw that no one was at the Jack in the Box, so he turned the car around and left.

our Dallas policemen to that kind of risk. They walk up to these cars—[Appellants objects. The court finds that the prosecutor is drawing inferences, 'which he is permitted to do'.]

\*     \*     \*     \*     \*     \*

If you can be hoodwinked and flim-flammed into giving a man like this probation, then God help us all... Now I know what my solemn word means to me and I would believe yours means as much to you or I would not have wanted you on that Jury. This man, by all of the evidence before you, this man is a person who has no respect for other people, for other people's property, or as I submit to you, *even for other people's lives*, he has forfeited any right in his present state of mind to be out there on the streets and in our community." (Emphasis added)

■ The appellant, a 26-year-old man with a ninth grade education and no prior convictions, was charged with unauthorized use of a vehicle, a third-degree felony, not theft, not attempted armed robbery, not attempted capital murder. In *Stein v. State*, 492 S.W.2d 548 (Tex.Cr.App.1973), we stated,

"[T]his Court has been faced with numerous cases where improper arguments and sidebar remarks by the prosecutor have forced us to reassert the critical importance of convicting an accused only upon that evidence presented, without attempting *to inflame or prejudice the minds of the jurors.*"

The record in this case reflects a course of conduct by the prosecutors which continually brought matters before the jury which were impermissible and that could only have been calculated to inflame and prejudice the minds of the jury. See *Boyde v. State*, 513 S.W.2d 588 (Tex.Cr.App.1974); *Stein v. State*, supra. The case is reversed on the ground of prosecutorial misconduct.

The judgment is reversed and remanded.

**ROBERTS, Judge, concurring.**

A plea of guilty before a jury is as close to a sure thing as one can come in our adversary system. It is almost impossible to commit reversible error in such a proceeding, but this case demonstrates that nothing is impossible if it is sought zealously enough. This case also reminds us that zeal must be limited by law. "A Lawyer Should Represent a Client Zealously *Within the Bounds of the Law.*" Rules Governing the State Bar of Texas, Article 12, Section 8 [usually known as the Code of Professional Responsibility], Canon 7 (emphasis supplied).

"In order to bring about just and informed decisions, evidentiary and procedural rules have been established by tribunals to permit the inclusion of relevant evidence and argument and the exclusion of all other considerations. \* \* \*

"Rules of evidence and procedure are designed to lead to just decisions and are part of the framework of the law. Thus while a lawyer may take steps in good faith and within the framework of the law to test the validity of rules, he is not justified in consciously violating such rules and he should be diligent in his efforts to guard against his unintentional violation of them. As examples, ... a lawyer should not by subterfuge put before a jury matters which it cannot properly consider."

*Id.*, EC 7–24 & 7–25.

I join Judge W. C. Davis's opinion. The State pursued a course of conduct that denied the appellant a fair trial. I write separately to emphasize one aspect of the misconduct that in itself would warrant a mistrial: the calling of an incompetent reputation witness as a means of evading the law of evidence on unadjudicated offenses.

It must be remembered that the only reason for calling a reputation witness is to give the jury knowledge of someone's moral character, which knowledge has been gained by the members of the community in which he lives and acts. See J. Wigmore, 5 *Evidence*, Sections 1610 & 1615 (J. Chadbourn rev. 1974). This appellant's community was in Dallas; he lived there and had been reared there. Yet the prosecuting attorneys called a reputation witness who

never had worked in Dallas and who never had talked about the appellant to anyone other than themselves.[1] How did they come to look so far afield from the appellant's community? Only one answer is possible: they called Officer Gonzales because he had once "stopped" the appellant. That is, they were not looking in good faith for witnesses who knew the appellant's reputation; they were looking for witnesses who knew about unadjudicated offenses the appellant had committed. We do not have to infer this; the prosecuting attorney explicitly revealed that his motive was to call a witness who had such knowledge in the hope that the jury would speculate about the extraneous offense even if the appellant did not carelessly open the door to inquiry about it.[2]

A variation on this improper tactic may be found in *Watson v. State*, 605 S.W.2d 877 (Tex.Cr.App.1980). The State called as a reputation witness a woman who said, "I haven't talked to anybody about him. * * [I know] only that he tried to kill me." Nevertheless, she was allowed to testify that the defendant's reputation was bad. This court held of course that it was error to admit such testimony, but on rehearing held that the error was harmless. *Mitchell v. State*, 524 S.W.2d 510 (Tex.Cr.App.1975), was cited.

Today's majority opinion also mentions *Mitchell*, so I think it is worthwhile to draw a distinction. Mitchell was tried for robbery. The police chief of the town in which the robbery occurred had no knowledge of Mitchell's reputation other than the robbery itself and Mitchell's rap sheet, yet he was allowed to testify that Mitchell's reputation was bad; this was harmless error. There was no testimony about an extraneous offense and no attempt to inject inadmissible evidence of an unadjudicated offense. Presiding Judge Onion's concurring opinion, 524 S.W.2d at 515, was well taken:

"I would caution against interpreting the majority's opinion as meaning that in any case the State is entitled to one free unqualified reputation witness provided there are other reputation witnesses to the same effect whose testimony is unchallenged. Each case must stand on its own bottom. For the State to call a well-known, respected and popular citizen or law enforcement officer as a reputation witness knowing he is not a qualified witness while hoping to render any error harmless by calling other witnesses who are qualified would, in my opinion, be bad faith."

I take it that "bad faith" includes something more than erroneous admission of evidence; it implies misconduct by the prosecuting attorneys.

In today's case there was such misconduct—an improper attempt to inject inadmissible evidence—and the court has held that it contributed to the denial of a fair trial. This issue of misconduct was not raised in *Watson*, and had it been raised that case might have had a different result. The prosecutors in *Watson* must have been calling that victim of an extraneous offense only for the improper motive of trying to inject inadmissible evidence, the same motive that is before us today.

The law of evidence does not now permit proof of character by evidence of opinion[3]

1. Although the majority opinion holds that Officer Gonzales' testimony was struck properly, it does not reveal that in so holding it has rejected the State's argument that Gonzales was a qualified witness because he had discussed the appellant's reputation with the prosecuting attorneys. The flaw in letting counsel manufacture their own reputation witness is too clear for discussion, but by this footnote I hope to reveal that the argument was raised and rejected in this case.

2. The prosecuting attorney argued: "You had another police officer come in and say he met him on July 14, 1978, and his reputation is bad. * * * [T]hat same man told you that he knew him and he met him in San Antonio, not in Dallas, and there were no questions beyond that so you can think about that for a minute. You can put all of these things together ..."

3. *Gholson v. State*, 542 S.W.2d 395, 402 (Tex.Cr.App.1976). This rule has been criticized severely and the modern statutes allow opinion evidence. See generally the panel opinion in *Watson v. State*, 605 S.W.2d 877, nn. 3–4 (Tex.Cr.App.1980).

or unadjudicated offenses.[4]   It would be proper for a prosecuting attorney to seek to change the law.   It is not proper for him to evade the law, to violate it by winks and innuendoes, to do directly what he may not do directly.   Such tactics with reputation witnesses are all too common in some counties.

There is a sad irony in this case: the State's counsel was intentionally violating a law in order to increase the punishment for the intentional violation of another law.   In a criminal trial, law violators should not be found at both tables.   Violations of law cannot be used to enforce law.   Justice Clark wrote in *Mapp v. Ohio*, 367 U.S. 643, 659, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081 (1961):

> "Nothing can destroy a government more quickly than its failure to observe its own laws .... As Mr. Justice Brandeis, dissenting, said in *Olmstead v. United States*, 1928, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944: 'Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example.   * * *   If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.' "

**4.** Tex.Code Crim.Pro. arts. 38.29 & 37.07, sec. 3(a).