Vance Levell JOHNSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 62258.

Court of Criminal Appeals of Texas,
Panel No. 2.

April 15, 1981.

James E. Davis, Texarkana, for appellant.

Louis J. Raffaelli, Dist. Atty., & Dennis P. Jones, Asst. Dist. Atty., Texarkana, Robert Huttash, State's Atty., Austin, for State.

Before DALLY, W. C. DAVIS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

This appeal is taken from a conviction for the offense of aggravated robbery in which the jury assessed punishment at fifty years.

In his sole ground of error appellant contends that the conviction should be reversed because he was denied the effective assistance of counsel in contravention of his rights secured by the Sixth and Fourteenth Amendments of the United States Constitution.

In *Ex parte Duffy*, 607 S.W.2d 507 (Tex.Cr.App.1980) we determined that the effectiveness of retained and appointed counsel should be judged by the same standard, that of "reasonably effective assistance." Our decision conforms with the recent holding by the United States Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). In *Duffy*, supra, at 514, we adopted the test used in *McKenna v. Ellis*, 280 F.2d 592 (5 CA 1961) and as quoted approvingly in *Caraway v. State*, 417 S.W.2d 159, 162 (Tex.Cr. App.1967) to be as follows:

> "We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render, and rendering effective assistance."

Of necessity, each case must turn on its own particular facts and circumstances. See *Benoit v. State*, 561 S.W.2d 810 (Tex.Cr.App. 1977). The adequacy of an attorney's services must be gauged by the totality of the representation. See *Ex parte Prior*, 540 S.W.2d 723 (Tex.Cr.App.1976) and *Williams v. State*, 513 S.W.2d 54 (Tex.Cr.App.1974). The allegations of ineffective assistance of counsel will be sustained only if they are firmly founded. *Faz v. State*, 510 S.W.2d 922 (Tex.Cr.App.1974) and *Long v. State*, 502 S.W.2d 139 (Tex.Cr.App.1973).

Accordingly we now turn to the facts of this case in order to ascertain if appellant's allegation of ineffective assistance may be sustained. The record reflects that appellant was represented at trial by retained counsel, and different counsel was appointed by the trial court after this Court granted an out of time appeal. There is no transcription of the court reporter's notes of the voir dire proceedings or the jury arguments contained in the record before us.

The evidence adduced at trial showed that appellant was arrested near McKinney three hours after the alleged robbery occurred in Texarkana. He and a passenger, Carl Brown, were stopped by two highway patrolmen because appellant's car had only one headlight burning. Both Officer Powell and Officer Dobecka testified that when asked for identification, appellant produced only an expired temporary driver's license. Officer Dobecka ran a record check on him and found a "similarity hit," [1] so they arrested both men.[2] Shortly Bowie County Deputy Sheriff Copeland contacted them, and the two men were transferred to the Bowie County Jail. At the time of the arrest the officers impounded the car and seized several items of clothes, a pearl handled revolver, and a quantity of small change and currency.

The State's evidence consisted largely of the testimony of Mr. Crow, the owner of Crow's Grocery Store in Texarkana, Mrs. Ruby Nichols, the assistant cashier at the grocery store, and Mrs. Louise Shemley, a customer present at the store during the robbery. They all variously testified that at approximately 6:00 p. m. two black men entered Crow's Grocery Store. One of them exhibited a gun and demanded the

---

1. While the record on this matter was not clearly developed, we understand that at the radioed request of Trooper Dobecka someone in the McKinney Police Department made a computerized inquiry of a central record collection system, either N.C.I.C. or T.C.I.C. or both, and received a response that a person fitting the physical description given but having a somewhat different name was wanted by a law enforcement agency.

2. For the headlight violation appellant earned a warning ticket. Since Trooper Powell testified that the check made by Dobecka was also "to make sure he had a valid license" and there was no further indication that appellant did not have one, we assume he was not arrested on

money from the cash register.[3] The two men then ran outside in a heavy rainstorm to a car. Additionally, Ms. Deborah Davids testified that she was driving by the grocery store when she heard what sounded like gun shots. She saw two men, whom she could not identify, get into a 1972 Cutlass. She followed the car and obtained the license number, which was later found to match that on the car of appellant.

Appellant defended that he was mistakenly identified. He claimed that he had come to Texarkana with Carl Brown from Lubbock, where they had been stationed in the Air Force, and they had stayed with the Brown family for several days. At the time of the robbery appellant and Carl Brown had gone to visit a brother, returned to the family house, eaten dinner, and were driving back to Lubbock. Both houses were shown to be located near the grocery store, which would be passed when driving a likely route from one house to the other.

Appellant contends that ineffective assistance of counsel was amply demonstrated during the trial, but for reasons about to be elucidated we disagree.

Pretrial, well in advance of trial, the lawyer filed "Defense Motions" in the nature of discovery by which he sought to learn practically everything germane to the offense, including identity of witnesses to it, results of any identification procedure, as well as *Brady* material.[4] While the record fails to reveal what action the trial court took with respect to the motions, testimony of appellant himself on cross examination and developments at trial indicate that his attorney did investigate the facts.[5]

The items taken from appellant's car were introduced at trial. He now complains that not only was there no pretrial motion to suppress the evidence filed, but the clothes, which were State's evidence, were introduced by appellant's attorney at the instance of the prosecutor.[6] In this particular appellant asserts "inadequacy of counsel is highlighted" for, as he sees it, "[w]ithout regard to the illegality of the search" which produced the evidence "its authenticity cannot be proven because of lack of proof of a proper chain of custody." He then criticizes his erstwhile trial attorney for also failing to move to suppress or to object to admission of other fruits of the search, a pistol and a bank bag of coins.

 It is clear enough to us, however, that the overall strategy formulated by trial counsel, from his investigation of the facts susceptible of being proved, dictated the tactical decisions to call for the clothing

---

that account. Thus, all that is left is the "similarity hit."

3. Currency and coins, everything, in the register was poured by Crow into a nondescript brown paper grocery bag.

4. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)—withholding evidence favorable to accused on guilt or punishment denies due process. Appellant does not now complain of a *Brady* violation.

5. Thus, appellant testified on cross examination:
"A: * * * I got a lawyer to tell me every witness ya'll have got and what they're going to say. * * *
Q: Right. He had my file, didn't he?
A: That's right."
And it is obvious from developments and maneuvers during trial that counsel had planned a strategy from his understanding of the facts.

6. Deputy Sheriff Carroll Copeland testified that he went to McKinney, joined Trooper Powell in

"the inventory" of appellant's car, recovered clothing he and other investigators "were looking for" and brought them back to Ronnie Rogers, a detective in the criminal investigation division of the Texarkana Police Department. On cross examination, counsel said he would "like to have those brought in," and the district attorney instructed someone to "[h]ave Mr. Rogers bring those in." When that was done, cross examination continued, the items of clothing were identified and Deputy Copeland was questioned about certain appearances and characteristics of them. At the end of cross examination the following occurred:
"[DISTRICT ATTORNEY]: Are you going to tender that?
[DEFENSE ATTORNEY]: Your Honor, I ask that these be marked and placed in exhibit [sic].
\* \* \* \* \* \*
[DISTRICT ATTORNEY]: No objection, Your Honor.
THE COURT: All right, they are received."

and to withhold objection to the pistol and money bags. We will not "second guess" his decisions in the sense of determining whether they were wisely made, but are permitted to express our perception that, regardless of the chain of custody of the clothing and validity of the search and seizure, the strategy was to get them before the jury to make several defensive points to demonstrate that they were not necessarily incriminating evidence.[7]

Identification was a sharply contested issue in this trial. Mr. Crow, who had a tunnel vision problem and was nearly blind, was unable to identify either of the participants in the robbery.[8] Mrs. Nichols and Mrs. Shemley both selected appellant and incorrectly picked out different individuals from the pretrial lineup.[9] A rebuttal witness for the State testified:[10]

"Q [DEFENSE ATTORNEY]: Detective Clingan, you say Mrs. Ruby Nichols positively identified [the defendant], is that correct?

A: Yes, Sir, she did.

Q: Did she positively identify someone else?

A: Yes, Sir, she did.

Q: Who was that?

A: Jesse Gates.

Q: Do you of your own knowledge know that Jesse Gates was in jail at the time?

A: Yes, Sir.

Q: That's where you got him from, upstairs in jail to bring him down to the line-up.

\* \* \* \* \* \*

Q: In fact, Jesse Gates gets as many votes as anybody else, doesn't he?

7. The State's theory was that the clothing was that worn by appellant and his confederate when they robbed Mr. Crow. As mentioned there was then in progress a July downpour, and witness Davids had testified that, after hearing what sounded like gunshots at Crow's Grocery on Seventh Street, she turned and watched two men move out of the store and run in the rain along a street for some distance to a car "parked around the corner that was headed east on Eighth Street." After Deputy Copeland identified the clothes he took from appellant's car counsel drew from him the concession that when he found the clothing three hours after the robbery they were dry and did not appear to have been out in the rain.

With respect to the pistol, the witnesses who did attempt to describe it said it had a dark handle; that one taken from appellant's car and exhibited to the jury was pearl handled. Displaying it after calling her on rebuttal, counsel established that appellant's pistol was "a different gun" from the one used in the robbery. Appellant would now make much of this testimony in faulting counsel for failing to suppress the pistol; yet, though the jury argument is not before us, surely the State was hard pressed to explain away the point of difference that counsel must have driven home.

As to the money, appellant notes critically that it "was never identified as coming from the robbery." Not only is that true, but counsel emphasized through his cross examination of other witnesses that the coins—and among them not a penny that one would expect from a grocery store cash register—were in a zippered vinyl sack inside "a bank sack," and appellant himself testified to a plausible explanation for his possession of all that.

8. Nevertheless, every gunshot that rang out came from Crow's own revolver as he emptied it toward the fleeing bandits. Mrs. Nichols said the five or six shots that were fired caused other people in the store to "hit the deck."

9. That a lineup had been conducted was first injected into the trial by appellant through his cross examination of the second witness presented by the State, Mrs. Nichols. After getting her to acknowledge that she "missed" identifying appellant's confederate, pointing out instead one who was an inmate at the time of the robbery, counsel sought leave for two individuals, presumably a part of the lineup, to be brought into the courtroom "for identification purposes," but over objection by the State the trial court refused the request. Jesse Gates, one of the men in the lineup who had since been confined in TDC, was later called as a witness for the defense, having been bench warranted back, to testify that one of the witnesses had fingered him as the gunman. What all this means to us is that trial counsel had thoroughly investigated the lineup matter and concluded that it might be utilized to advantage in the face of two unswerving incourt identifications of appellant as the robber with a gun.

10. No doubt the State presented Detective Clingan to refute the direct testimony of Gates, see note 9, above, and to dispel whatever inferences appellant might urge from the partially mistaken identification by Mrs. Nichols, *id.*

A: Yes, sir, he did. He got tentatively identified one time by Mr. Crow, and positively one time by Mrs. Nichols.

\* \* \* \* \* \*

Q: Would you read the description of James Walls?

A: Yes, Sir. He's a colored male, twenty-one years of age, height, five foot six inches, weight, one hundred sixty pounds.

Q: Okay. This is five-six. Would you look at Carl Brown's and Vance Johnson's height and see what their height is?

A: Jesse Gates...

Q: No, Carl Brown and Vance Johnson.

A: Okay. Carl Brown is five foot eleven inches, and Vance Johnson—is that the other one you asked for?

Q: That's right.

A: Okay, he's five foot eleven inches.

Q: That's five inches difference there. On a half a foot, that's quite a bit of difference between the two, is there not?

A: Yes, Sir."

Appellant's attorney made no request for a *Martinez* pretrial identification hearing,[11] and none was held; and no objection made during the incourt identification. Perceiving these omissions as failings of counsel, appellant now says they are a mark of ineffectiveness.

■ We note that the United States Supreme Court in *Watkins v. Sowders*, —— U.S. ——, 101 S.Ct. 654, 655, 66 L.Ed.2d 549 (1981), while declining to adopt a per se rule compelling the trial court to hold an identification hearing out of the presence of the jury, stated:

"A judicial determination outside the presence of the jury of the admissibility of identification evidence may often be advisable. In some circumstances, not presented here, such a determination may be constitutionally necessary."

11. *Martinez v. State*, 437 S.W.2d 842, 848 (Tex. Cr.App.1969).

Still, the purpose of such a hearing is to decide if an incourt identification made or about to be made is the product of or tainted by a prior identification procedure so suggestive that it created a very substantial likelihood of misidentification. *Martinez v. State*, supra; see *Turner v. State*, 600 S.W.2d 927, 932 (Tex.Cr.App.1980).

■ Since trial counsel had no criticism of the lineup itself and even now appellant does not suggest that it tainted the incourt identification made by the two witnesses, we are at a loss to comprehend what a *Martinez* hearing might accomplish. See *Boykin v. State*, 487 S.W.2d 128, 131 (Tex. Cr.App.1972). Again, it seems to us that, well aware of the prospective identification of appellant the two witnesses would make in court, trial counsel opted to weaken it by showing that one of them had been mistaken in an earlier procedure. The wisdom of the tactic is not for us to judge, for this Court does not even inquire into such matters unless "from all appearances there still is no plausible basis in strategy or tactics for [counsel's] actions," *Ex parte Ewing*, 570 S.W.2d 941, 945 (Tex.Cr.App.1978).

Next, the "crowning high water mark of ineffectiveness," according to appellant, occurred during the punishment phase of the trial. The State offered the testimony of Officer Clingan and Officer Powell. Officer Clingan stated on direct examination that appellant had a bad reputation for being a peaceful and law-abiding citizen. On cross examination the following exchange occurred:

"Q [DEFENSE COUNSEL]: Detective Clingan, upon what does—do you know whether the Defendant has ever been convicted of a felony before, or not?

A: Yes, Sir, I do.

Q: Has he?

A: No, Sir, he has not.

Q: Has not. Yet, you say his reputation is bad.

A: Yes, Sir, it is.

Q: But yet, he's never been convicted of a crime. How can you say that he has a bad reputation? Do you live in the community in which he resides?

A: I determined that through Police investigation of—we've got holds on him for Lubbock for this same type offense.

Q: But he's never been convicted of a crime, you said.

A: No, Sir.

[DEFENSE ATTORNEY]: Okay, no further questions."

Officer Powell testified similarly as to appellant's reputation. On cross examination the following testimony was elicited:

"Q [DEFENSE ATTORNEY]: Officer, have you checked with Mr. Johnson's neighbors and friends, the people that he knows in the community?

A: No, Sir, I haven't.

Q: Then, you can't say whether they know—whether they say he has a

good or bad reputation, then, do you?

A: No, Sir, I can't.

[DEFENSE ATTORNEY]: No further questions.

[PROSECUTOR]: That's all, Your Honor.

THE COURT: Stand down."

These two witnesses were clearly incompetent to testify as to appellant's reputation.[12] Appellant's counsel never objected to nor moved to strike the witnesses' testimony or sought a mistrial, and admittedly this feature in the case is most troublesome.[13]

■ By the express terms of Article 37.-07, § 3(a) the reputation of the accused who has just been found guilty is admissible, and thus it is an issue at the punishment phase of the trial, *Hunter v. State*, 530 S.W.2d 573, 576 (Tex.Cr.App.1975). Though commonplace it is for "reputation testimony" to be adduced, the ritualistic manner in which a witness so often has been qualified by simply saying that he knows that reputation inquired about—without a firmer predicate being laid [14]—may tantalize the cross

12. Appellant had never resided in Texarkana, in fact this was his first visit to Texarkana since his childhood. As was written in *Wright v. State*, 609 S.W.2d 801, 807 (Tex.Cr.App. 1981) (Roberts, J., concurring):
"It must be remembered that the only reason for calling a reputation witness is to give the jury knowledge of someone's moral character, which knowledge has been gained by members of the community in which he lives and acts.... This appellant's community was in Dallas; he lived there and had been reared there. Yet the prosecuting attorneys called a reputation witness who never had worked in Dallas and who never had talked about the appellant to anyone other than themselves..., they called Officer Gonzales because he had once 'stopped' the appellant. That is, they were not looking in good faith for witnesses who knew the appellant's reputation; they were looking for witnesses who knew about unadjudicated offenses the appellant had committed."

13. The only witness called by appellant's attorney during the punishment phase was Mrs. Louise Shemley, who had just finished testifying for the State as an eyewitness to the offense. She testified as follows:
"Q [DEFENSE COUNSEL]: And, will you tell the jury whether the conduct was abusive, or whether any strong threats were

made against you or any people there in the store?
A: No, Sir. There was—he didn't threaten me at all. As I said, he was—they were both very polite, and they just asked me would I please step around to the side of the counter, and they showed, you know, showed me the gun.
Q: Did you at any time feel severely threatened by. the individuals?
A: Well, not by what he said, but I mean, anybody sticks a gun in your face—I mean.
* * * * * *
A: ... they don't have to say anything."
It is dubious at best to assert that being "polite" during the commission of an offense with a deadly weapon is probative in mitigation of punishment. Appellant had never been previously convicted of a felony when the jury assessed his punishment at fifty years.

14. See *Mitchell v. State*, 524 S.W.2d 510, 512 (Tex.Cr.App.1975): "The requirement that a reputation witness have *discussed* the bad reputation of the accused has received somewhat less attention from this Court. * * * Without the requirement of discussion with other members of an accused's community, a witness' testimony concerning the accused's reputation for being a peaceful and law-abiding citizen would be nothing more than an inadmissible

examiner into a form of brinksmanship by examining the witness on voir dire in the presence of the jury.[15] Essentially that is what trial counsel did here in asking Officer Clingan on cross examination the "how can you say" question.[16] "We should not, however, attempt to ascertain the specific reason why counsel interrogated the arresting officers in the manner established by the record," *Ewing v. State*, 549 S.W.2d 392, 395 (Tex.Cr.App.1977), and "an isolated instance of failure to object to inadmissible evidence does not necessarily render counsel ineffective," *Cude v. State*, 588 S.W.2d 895, 897 (Tex.Cr.App.1979). Yet, we are constrained to observe that on direct examination appellant testified as follows:

"Q: Did—have you ever been convicted of a felony before?

A: No.

Q: This is your first time to ever have been in trouble?

A: Right.

Q: What I mean when I say have you ever been in trouble, this is the first time you've ever been charged."

In this connection see *Ex parte Ewing*, 570 S.W.2d 941, 947 (Tex.Cr.App.1978), holding that an accused is not denied effective assistance of counsel where the trial lawyer was pursuing a plausible defense strategy but was surprised by revelations of prior police encounters which his client had said did not exist.

Whatever prejudicial impact the response of Clingan and the failures to challenge the qualifications of him and Powell to give an opinion as to his reputation, considering the totality of that representation provided appellant by trial counsel, we cannot say it was of a sufficient degree to constitute ineffective assistance.[17] *Ewing v. State*, and *Ex parte Ewing; Ex parte Prior; Ex parte Caraway;* cf. *Duffy v. State*—all supra. This ground of error is overruled.

The judgment is affirmed.

opinion." (Emphasis in original) See also the authorities excerpted in *Watson v. State*, 605 S.W.2d 877, 878–879 (Tex.Cr.App.1979, Opinion on Original Submission), and the final conclusion that, though error attended admission of the challenged testimony, under the circumstances it was "harmless beyond a reasonable doubt," *id.* at 886 (1980, Opinion on Rehearing).

**15.** See *Hunter v. State*, 530 S.W.2d 573, 576 (Tex.Cr.App.1975), and the invitation in *Curtis v. State*, 519 S.W.2d 883, 888 (Tex.Cr.App. 1975) that was extended in lieu of the "proper procedure" that permits an accused to examine reputation witnesses outside the presence of the jury, as outlined in *Crawford v. State*, 480 S.W.2d 724 (Tex.Cr.App.1972).

**16.** Conventional wisdom in techniques of cross examination cautions against asking an adverse witness, especially "a shrewd police officer," Owen, Defending Criminal Cases before Juries 186 (Prentice-Hall, Inc. 1973), a "why" question particularly when the answer is not known by the cross examiner, Tinker, Cross Examination Techniques, EE–2, Advanced Criminal Law Course, Vol. 2 (State Bar of Texas, July 1979). But like most general rules there are exceptions, *ibid.* Moreover, there is a corollary admonition to the questioner who receives a harmful response: "Do not let the jury know when you have been hurt," *ibid.* and Federal Criminal Practice Manual H–19 (Criminal Defense Lawyers Project). Thus, the making or withholding an objection is a matter of tactics. See Ray, Law of Evidence § 28, Texas Practice 37–38.

**17.** While the punishment assessed by the jury against this first offender may seem inordinate, we notice that while testifying in his own behalf appellant fared rather badly, and particularly on the several occasions when the State was allowed to insist in an argumentative posture that appellant judge the credibility of his accusing witnesses in terms of whether appellant was "saying they lied" when they testified thus and so. Indeed, once the trial judge got into it the exchange that followed reads much like that critically reported in *Temple v. Duran*, 121 S.W. 253, 254–255 (Tex.Civ.App.1908, no history) with the holding: "Clearly it was error." Similarly, the rule in criminal law matters, as stated in *Williams v. State*, 112 Tex. Cr.R. 307, 17 S.W.2d 56, 58 (1928): "It is improper to require a witness to express his opinion as to the truth or falsity of testimony contradicting him." See also Ray, op. cit., § 601, at 552. However, we hasten to add, the State is permitted to ask a testifying accused if he knows of "any reason why" a prosecuting witness would complain against him, *Weaver v. State*, 68 Tex.Cr.R. 214, 150 S.W. 785, 786 (1912), or testify falsely against him, *Bodkins v. State*, 75 Tex.Cr.R. 499, 172 S.W. 216, 217 (1914), and such questions were also asked of appellant in the case at bar; his suggestion that Deborah Davids might have been paid to testify as she did does not seem helpful to his cause.