Opinion filed November 8,
2012

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-10-00335-CR

                                                    __________

 

                                   JAN
DAVID CLARK, Appellant

 

                                                             V.

 

                                      STATE
OF TEXAS, Appellee



 

                                   On
Appeal from the 244th District Court

 

                                                             Ector
County, Texas

 

                                                 Trial
Court Cause No. C-35,136-T

 



 

                                            M
E M O R A N D U M   O P I N I O N

            The
jury convicted Jan David Clark of the offense of murder and assessed his
punishment at confinement for life and a fine of $10,000.  We affirm.

            The
decedent in this case was Susan Clark, appellant’s wife.  

            Appellant
testified that, on the evening of January 31, 2008, he had been to a business
meeting with other people who were involved in the multi-level sale of
nutritional supplement products known as Enzacta.  Appellant’s wife was not in
the business with him and did not attend the meeting; she stayed at home.  Appellant
got home “about 10:30 [p.m.].”  He intended to perform an exorcism on Susan that
night to rid her of a demon, but he felt like it had to be done at the right
time.  He had never performed an exorcism before.  He stayed in his office at his
house until 10:55 p.m. and then went to the bedroom.  Susan was already in
bed.  When appellant began saying, “holy, holy, holy, Lord God Almighty,” Susan
ran to the bathroom to “avoid me laying my hands on her head.”  She dialed 911,
but he took the phone away from her when he followed her into the bathroom.

            The
dispatcher for the City of Odessa received that incomplete 911 call.  When the call
came in, the city’s caller identification system registered appellant’s name
and address and recorded the time as 11:04 p.m.  The dispatcher gave the
information to Ector County Sheriff’s Office personnel.  Deputy Victor Tercero
responded and went to appellant’s house.  A few minutes later, Sergeant Mike
Griffis joined him there.  The officers knocked on doors and looked through
windows into lighted rooms of the house but saw nothing to indicate anything
out of the ordinary, so they left.

            However,
the bathroom into which appellant followed Susan could not be seen by looking
through the windows of the house.  After appellant followed Susan into the
bathroom and terminated the 911 call, he “laid hands” on her head.  According
to appellant, at the point that he “laid hands” on Susan, he just lost control
of himself.  He testified that she fought against him.  She eventually ended up
facedown on the floor, and appellant was sitting on her backside and was straddling
her.  He remembered “hearing her say clearly, ‘I can’t breathe.’”  Appellant testified
that he continued to hold her down and that he smothered her.

            From
the time that appellant “laid hands” on Susan and lost control of himself, he
began to chant, and the chanting “went on until through the whole situation.”  In
a video statement to law enforcement officials, appellant said he felt that his
own body had been overcome with the spirit of a Cherokee witch doctor.  By his
own testimony, appellant became sexually aroused, pulled up Susan’s shirt, and
pulled down her panties.  “There was a kind of vision like riding a horse and a
bunch of wild Indian sounds and more chanting and whooping.”  He rolled her
over, and when he saw her face, “the whole chanting thing was gone.”  Before
the deputies arrived, appellant put a white sheet over Susan, poured grape
juice over her, and placed three crosses on her body.  He called for neither an
ambulance nor any other help for Susan.

            Appellant
did, however, call his friend, Stephen Culver, at approximately 3:15 a.m. on
February 1.  Culver did not answer the telephone in time, but he did listen to
the message that appellant left and returned the call to appellant.  Culver did
not testify as to the content of the conversation, but he did testify that,
after he talked to appellant, he and his wife became concerned and decided to
contact law enforcement personnel.

            One
of the Culver’s employees was married to Phillip Partin, an FBI agent; they
decided to call him.  Agent Partin arrived at the Culver’s home around 4:20
a.m.  Culver rode with Agent Partin so that Culver could show the agent where
appellant lived.  By arrangement, “Odessa law enforcement” followed them.  They
arrived there at about 5:00 a.m. and merely pointed out appellant’s house to
the deputies and left.  Agent Partin testified and confirmed Culver’s testimony.

            Five
and one-half to six hours after he had been to appellant’s house the first
time, Deputy Tercero was dispatched to the house again.  Lieutenant Luffman,
Sergeant Griffis, and Investigator Trujillo met him there.  Deputy Tercero
testified that, when he went back to the house the second time, a pickup had
been moved from under the carport, and its engine was warm.  A light in the
carport that had not been burning at his first visit to appellant’s house was
now on.  Appellant testified that he moved the pickup out of the carport after
he killed Susan so that a receiver inside the house could pick up and play
Christian music from a satellite radio broadcaster in the vehicle.  Although
appellant usually had “about eight beers a night” and smoked “a couple of puffs
a day” of marihuana from his pipe, he had not done so the night of the homicide.

            When
the deputies made the second trip to appellant’s home, Investigator Trujillo
knocked on the door to the house, and appellant answered.  When the officers
entered the residence, they found Susan lying dead on the master bathroom
floor.  Investigator Trujillo “read [appellant] his rights.”  Sergeant Griffis
placed appellant in the sergeant’s patrol unit.  Appellant was taken to the
detention center.

            At
the time that appellant killed Susan, Steven John McNeill was an investigator
for the Ector County Sheriff’s Office.  Investigator McNeill was at his home on
the morning of February 1, 2008, when he received a call to assist in an
investigation. He and another investigator interviewed appellant at
approximately 7:30 that morning.  A video was made of the hour-long interview,
and it was played for the jury.  Although there were some inconsistencies,
appellant told the investigators essentially the same thing that he related
during the trial.

            At
the time of this homicide, Christin Timmons was a sexual assault nurse examiner
at Medical Center Hospital’s emergency room.  She examined Susan on February 1,
2008.  She found multiple bruises on Susan’s body, ruptured blood vessels, and abrasions
on her nose.  Timmons also found four “pretty new” abrasions on Susan’s labia
minora, indicating that “[s]omething of a harder substance rubbed against it
causing some friction.”  Appellant denied having any sexual activity with Susan
since 2000.

            Dr.
Lloyd White, a board certified forensic pathologist, testified that he was
self-employed as a contract pathologist for the Tarrant County Medical
Examiner’s District in Fort Worth.  He had been appointed as a deputy medical examiner
there.  He performed autopsies for Ector County at the request of the Ector
County Medical Examiner.

            On
February 2, 2008, Dr. White performed an autopsy on Susan’s body.  He found
that Susan had an abrasion on her nose and that she had multiple bruises,
including defensive bruises that would indicate that Susan struggled and put up
a fight.  Dr. White also noted the injury to the labia minora that Timmons had
noted during her examination.  That injury was consistent with assaultive
behavior.  As did Timmons, Dr. White also noticed “a lot of petechiae.”   Petechiae
are small hemorrhages in a person’s skin and “are typically associated with
increased vascular pressure in the chest and with hypoxia or lack of air and
oxygen to the organs and tissues of the body.”  Petechiae typically accompany
traumatic asphyxia.  Dr. White noted “very prominent petechiae on the face, the
membranes of the eyes and some areas of the upper torso and on the arms.”  Dr.
White was of the opinion that the cause of death was “asphyxia by smothering”
and that the manner of death was homicide.

            Appellant
does not claim that he did not smother his wife to death.  However, he
maintains that he did not intend to cause her death or to cause her serious
bodily harm; he was trying to perform an exorcism to rid Susan of a demon that
he thought she had.  That is the subject of appellant’s second point of error,
in which he argues that the evidence is insufficient to show that he
intentionally or knowingly caused Susan’s death or that he engaged in conduct
that led to her death.  It is appellant’s position that the evidence “would
simply show an accident that resulted in his wife’s death.”

            We review a sufficiency of the evidence issue under the
standard of review set forth in Jackson v. Virginia, 443 U.S. 307
(1979).  Brooks v. State, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); Polk
v. State, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref’d). 
Under the Jackson standard, we examine all of the evidence in the
light most favorable to the verdict and determine whether, based on that
evidence and any reasonable inferences from it, any rational trier of fact
could have found the essential elements of the offense beyond a reasonable
doubt.  Jackson, 443 U.S. at 319; Isassi v. State, 330 S.W.3d 633, 638 (Tex.
Crim. App. 2010). 

            As
Susan’s murder was charged in this case, it was incumbent upon the State to
prove beyond a reasonable doubt that appellant either intentionally or
knowingly caused Susan’s death or that he intended to cause serious bodily
injury and committed an act clearly dangerous to human life that caused Susan’s
death.  Tex. Penal Code Ann. § 19.02
(West 2011).

            Mental
culpability is of such a nature that generally it must be inferred from the
circumstances under which the prohibited act occurred.  Griffith v. State,
315 S.W.3d 648, 651 (Tex. App.—Eastland 2010, pet. ref’d).  The trier of fact
may infer a culpable mental state from the acts, words, and conduct of the
accused.  Id.  The factfinder may also infer intent from acts that
indicate a consciousness of guilt.   Mashburn v. State, 272 S.W.3d 1, 14
(Tex. App.—Fort Worth 2008, pet. ref’d).

            Appellant
selected the exact time that he confronted Susan.  He chased her into the
bathroom.  He did not want her to make the 911 call, and he terminated it.  He
did not answer the door when the officers first responded to the incomplete 911
call.  He did not call 911 or seek any outside medical help for Susan, although
he moved his vehicle so that he could listen to Christian radio.  He made a
conscious decision not to call the police.  He said that he did not call 911
because he did not want to go to jail.  He told Culver not to call 911 because
he did not want to go to jail.

            Susan
had an abrasion on her nose and had suffered multiple bruises, including
defensive bruises that would indicate that Susan struggled and put up a fight. 
There were “a lot of petechiae” on Susan’s body.  The petechiae were very
prominent on Susan’s face, the membranes of her eyes, and some areas of her
upper torso and arms.  There was an abrasion injury to the labia minora.  That
injury was consistent with assaultive behavior.  Appellant denied having sex
with Susan since 2000.  However, when pressed, he testified that it was
possible that the sexual abrasions suffered by Susan could have happened during
his horse-riding vision.

            We
hold that, when we examine all of the evidence in
this case in the light most favorable to the verdict, together with the
reasonable inferences from it, a rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt.  Point of Error No.
Two is overruled.

            In
his first point of error, appellant maintains that the autopsy on Susan’s body
was performed by an unauthorized person and that, therefore, the trial court
erred when it denied his motion to suppress the autopsy results.

            Dr.
White, a board certified forensic pathologist, testified outside the presence
of the jury.  As we noted earlier, Dr. White performed the autopsy upon Susan’s
body.  He told the trial court that he was self-employed and that he performed
contract pathology services for Dr. Nizam Peerwani, the chief medical
examiner of the Tarrant County Medical Examiner’s District.  Dr. Peerwani
appointed Dr. White as a deputy medical examiner.  The district includes
Parker, Denton, Johnson, and Tarrant Counties.  Dr. White testified that he has
never been a medical examiner for Ector County.  However, Dr. Peerwani had
entered into a relationship with Ector County whereby he was a deputy medical
examiner of Ector County.

            At
the hearing on appellant’s pretrial motion to suppress, Dr. Nathan C. Galloway
testified that he was the duly appointed medical examiner for Ector County at
the time that Dr. White performed the autopsy on Susan Clark.  However,
there were no facilities in Ector County in which he could perform autopsies,
and he did not perform the autopsy on Susan’s body.  Dr. Galloway testified
that Dr. White worked for the Tarrant County Medical Examiner’s District, with
which Ector County had an agreement, although he did not testify about the
specific details of that agreement.  The trial court overruled the pretrial motion
to suppress, made the same ruling at trial, and admitted the autopsy results
into evidence.

            When
we review a trial court’s ruling on a motion to suppress, we will do so for an
abuse of discretion.  We will overturn the trial court’s ruling only if it is
outside the zone of reasonable disagreement.  Martinez v. State, 348
S.W.3d 919, 922–23 (Tex. Crim. App. 2011).  We will apply a bifurcated standard
of review and will give almost total deference to a trial court’s determination
of historical facts and mixed questions of law and fact that rely upon the
credibility of a witness.  However, we will apply a de novo standard of review
to pure questions of law and mixed questions that do not depend on credibility
determinations.  Id.

            Appellant’s
assertion finds its basis in Tex. Code
Crim. Proc. Ann. art. 49.25 (West Supp. 2012).  Article 49.25 provides,
among other things, for the organizational structure for the office of medical
examiner.  Even if we were to assume that there was no compliance with that organizational
structure in this case, we are of the opinion that noncompliance does not
affect the admissibility of the autopsy results.  We agree with the Fort Worth
Court of Appeals that Article 49.25 does not contain any provision that
provides for the exclusion of evidence arising out of an autopsy that was not
performed in accordance with the structure of Article 49.25.  Gower v. State,
No. 02-10-00362-CR, 2011 WL 4916438 (Tex. App.—Fort Worth Oct. 13, 2011, no
pet.) (mem. op., not designated for publication); see Tex. Code Crim. Proc. Ann. art. 38.23
(West 2005).

            As
far as separate exclusionary rules are concerned, the Fort Worth court in Gower
addressed a similar question and quoted from Wilson v. State, 311 S.W.3d
452, 458–59 (Tex. Crim. App. 2010), wherein the court said, “The underlying
purpose of both the federal exclusionary rule and article 38.23 is the same: to
protect a suspect’s privacy, property, and liberty rights against overzealous
law enforcement.  As such, both exclusionary rules are substantive in nature,
as they provide a remedy for the violation of those rights.”  Therefore, one
may not invoke the rule for violations not related to the purpose of the rule
“or to the prevention of the illegal procurement of evidence of crime.”  Wilson,
311 S.W.3d at 459.

            Furthermore,
we find it instructive that the Texas Court of Criminal Appeals has held that,
“as a general rule, medical examiners are not considered ‘other law enforcement
personnel’ under Rule 803(8)(B) [of the Texas Rules of Evidence] as far as
their duties relate to the preparation of autopsy reports.”  Garcia v. State,
868 S.W.2d 337, 342 (Tex. Crim. App. 1993).   Appellant here has not shown how
a failure to follow the organizational structure of Article 49.25 is related to
a violation of his rights or how the application of the exclusionary rule in
this case would serve to meet the purposes of the rule.  See Watson v. State,
10 S.W.3d 782, 784 (Tex. App.—Austin 2000, no pet.) (stating that the main
purpose of the exclusionary rule is to deter unlawful acts that violate the
rights of criminal suspects and citing instances in which courts have declined
to apply Article 38.23 to alleged statutory violations).  Point of Error No. One
is overruled.

            In
his third and final point of error, appellant claims that he was denied
effective assistance of counsel because trial counsel failed to present any
witnesses or evidence at the punishment phase of the trial.

To
prevail on a claim of ineffective assistance of counsel, an appellant must establish
that his lawyer’s performance fell below an objective standard of
reasonableness and that there is a “reasonable probability” the result of the
proceeding would have been different but for counsel’s deficient performance.  Strickland
v. Washington, 466 U.S. 668, 693–94 (1984); Mallett v. State, 65
S.W.3d 59, 62–63 (Tex. Crim. App. 2001).  A reasonable probability is a
probability sufficient to undermine confidence in the outcome of the trial.  Hernandez
v. State, 726 S.W.2d 53, 55 (Tex. Crim. App. 1986).  The purpose of this
two-pronged test is to judge whether counsel’s conduct so compromised the
proper functioning of the adversarial process that the trial cannot be said to
have produced a reliable result.  Thompson v. State, 9 S.W.3d 808, 812–13
(Tex. Crim. App. 1999).

The
review of defense counsel’s representation is highly deferential and presumes
that counsel’s actions fell within a wide range of reasonable professional
assistance.  Tong v. State, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). 
Appellant must overcome the presumption that, under the circumstances, the
challenged action might be considered sound trial strategy.  Jackson v.
State, 877 S.W.2d 768 (Tex. Crim. App. 1994); Hayden v. State, 155
S.W.3d 640, 648 (Tex. App.—Eastland 2005, pet. ref’d).  When the record is
silent on the motivations underlying counsel’s tactical decisions, the
appellant usually cannot overcome the strong presumption that counsel’s conduct
was reasonable.  Thompson, 9 S.W.3d at 813.  In order to defeat Strickland’s
presumption of reasonable professional assistance, “any allegation of
ineffectiveness must be firmly founded in the record, and the record must
affirmatively demonstrate the alleged ineffectiveness.”  Id. at 814
(quoting McFarland v. State, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). 
We do not inquire into trial strategy unless no plausible basis exists for
trial counsel’s actions.  Johnson v. State, 614 S.W.2d 148, 152 (Tex. Crim.
App. 1981).  When the record contains no evidence of the reasoning behind trial
counsel’s actions, we cannot conclude that counsel’s performance was deficient.
 Jackson, 877 S.W.2d at 771.

Appellant
has failed to name any witness who was available and whose testimony would have
benefited him.  A claim of ineffective assistance of counsel can be based upon
an attorney’s failure to present witnesses only if the appellant can
demonstrate that such witnesses were available and that their testimony would have
been of benefit to him.  Ex parte White, 160 S.W.3d 46, 52 (Tex.
Crim. App. 2004).  Appellant’s third point of error is overruled.




 

The
judgment of the trial court is affirmed.

 

            

                                                                        JIM
R. WRIGHT

                                                                        CHIEF
JUSTICE

 

November 8, 2012

Do not publish. 
See Tex. R. App. P. 47.2(b).

Panel consists of: Wright, C.J.,

McCall, J., and Gray, C.J., 10th
Court of Appeals.[1]









[1]Tom Gray, Chief Justice, Court of Appeals, 10th
District of Texas at Waco, sitting by assignment to the 11th Court of Appeals.