**Dionicio A. CRUZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 56349.**

Court of Criminal Appeals of Texas, Panel No. 3.

Sept. 19, 1979.

Rehearing En Banc Denied Oct. 10, 1979.

---

Gerald H. Goldstein, San Antonio, for appellant.

Bill M. White, Dist. Atty., Federico (Fred) G. Rodriguez, Charles T. Conaway and Bennie F. Steinhauser, Jr., Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

Before DALLY, W. C. DAVIS and CLINTON, JJ.

DALLY, Judge.

## OPINION

This is an appeal from a conviction for murder. Punishment is imprisonment for thirty-five years.

Appellant contends that the trial court erred because it erroneously admitted into evidence an inculpatory statement prepared by appellant and his attorney. We agree and reverse the judgment.

The facts and circumstances are unique; we trust such facts and circumstances will never again be presented. Appellant contacted his attorney Mr. Earl Hill by telephone on January 23, 1973, regarding an

incident in which appellant shot and killed Vicki Earline Son. Hill drove to where appellant was located, talked to appellant, and then went with appellant to view the body and the apartment where the shooting took place. They then returned to Hill's office where Hill questioned appellant and wrote out a statement regarding the events which culminated in Son's death. As the statement was being typed by Hill's secretary, Hill called the San Antonio police and told them of Son's death. Hill had appellant sign the statement without allowing appellant to read it, and without reading to appellant the *Miranda* warnings which Hill had instructed his secretary to type at the top of the statement.

Hill and appellant then went to the police station. They met Detective Frank Castelleon, who asked if he could take a statement from appellant. Hill replied that that would not be necessary because he had already taken a statement, and he gave Castelleon the statement in question. Castelleon looked over the statement and then began to read appellant his *Miranda* rights from the top of the statement, prior to having appellant read and sign the statement. Hill interrupted Castelleon and told him that the reading of appellant's rights was not necessary because appellant already knew his rights. Appellant then signed the statement without reading it and was immediately arrested.

On September 19, 1973, a *Jackson v. Denno* hearing was held on appellant's motion to suppress the statement. The trial judge tentatively ruled the statement inadmissible, but allowed both parties to present briefs on the issue. In a second hearing before another judge, which was held immediately prior to trial on May 21, 1975, the trial judge held the statement to be admissible.

Hill testified at the hearings that it was his "three-fold purpose" to render the statement inadmissible by having appellant sign the statement without reading it, by deliberately failing to read appellant his *Miranda* rights, and by making the statement "his own version" of what appellant told him and what he saw at the scene of the crime, rather than simply recording what appellant told him. Hill testified as follows:

"Q. Did you ever let him read the statement?

"A. No. I did not.

"Q. Are the facts contained in that statement the facts that you put in the statement as a result of what you thought occurred or as what Mr. Cruz told you?

"A. Both. As a result of him describing some details to me and me asking questions and paraphrasing it.

"Q. Did you write the statement in longhand?

"A. Yes.

"Q. And you did not let him read the statement?

"A. No.

"Q. Then did you give the statement to the secretary?

"A. Yes.

"Q. And she typed it?

"A. That's correct.

"Q. Was the statement brought back to you?

"A. Yes, sir.

"Q. Did Mr. Cruz sign it?

"A. Yes, sir.

"Q. Did you tell him to sign it?

"A. Yes, sir.

"Q. At that time, while he was doing this, he felt that that statement was going to remain in your files; is that correct?

"A. Well, I don't know if he felt that or not.

"Q. Well, let me rephrase it. He was doing everything that you told him to do, as a attorney-client relationship?

"A. That's correct.

"Q. But you did not give him any warning—

"A. No, sir.

"Q. —that he did not have to make a statement?

"A. No.

"Q. And any statements he gave could be used against him?

"A. That's correct.

"Q. And you deliberately did not let him read that statement for a certain purpose?

"A. Yes."

* * * * * *

"Q. And, that there was mistakes in that statement—if there were, Mr. Cruz was never given an opportunity to correct that statement?

"A. Correct.

"Q. And, if that statement is true and correct, Mr. Cruz doesn't really know it?

"A. Correct."

* * * * * *

"Q. Mr. Hill, that statement that has been marked State's Exhibit Number One is really your statement, and not the Defendant's statement?

"A. Well, if you put it in those terms, yes."

Appellant testified that he never read the statement or knew its contents, and that he signed the statement solely on the advice of Hill. The statement, along with proof of the corpus delicti, provided the primary evidence of appellant's guilt.

At trial, appellant's counsel questioned Detective Castelleon regarding the statement as follows:

"BY MR. GONZALES:

"Q. But, it still remains, Mr. Castelleon, that State's Exhibit Number Forty, and the contents therein, you have no knowledge who made the statement or prepared that information that is contained therein; is that correct?

"A. That's correct.

"Q. You cannot say that the contents of that statement reflected in State's Exhibit Number Forty, or testimony or statements made by the Defendant, those are made by the Defendant, Tony Cruz? Yes or no?

"A. That's correct.

"Q. It is correct, that you cannot say that?

"A. There is not any way that I can tell that he himself made this statement.

"Q. Okay."

* * * * * *

"Q. Are you testifying that what is involved in the contents of that statement, or the statement there are the statements made by the Defendant, Tony Cruz? Do you have any personal knowledge of that?

"A. No, sir.

"Q. That statement, State's Exhibit Number Forty, was given to you by an individual by the name of Mr. Earl Hill; is that correct?

"A. Yes, sir.

"Q. And not by the Defendant, Tony Cruz; is that correct?

"A. That's correct.

"Q. You do not have any knowledge—or you own personal knowledge, that that statement and what is written in that statement was made by Mr. Tony Cruz?

"A. No, sir.

"MR. GONZALES: We object, Your Honor, that this Exhibit has not been connected with the Defendant. This is a piece of paper. There is no connection whatsoever and it is hearsay, as far as we know, and another individual give it to him, and the proper predicate for introducing this statement has not been laid. We object to it."

Counsel's objection was well taken; the evidence adduced did not show that the statement was accurate or that the statement truthfully reflected what appellant told Hill. Art. 38.21, V.A.C.C.P., permits a statement of an accused to be used in evidence against him. This statute necessarily implies that the prosecution must lay the proper predicate and show that, in

fact, the statement was indeed made by the accused. Cf. *Pierson v. State,* 145 Tex.Cr.R. 388, 168 S.W.2d 256 (1943). Hill testified that the statement was a joint creation and that it included facts related as true by appellant as well as facts hypothesized to be true by Hill, all written in Hill's own words. Appellant apparently never read the statement and he signed it at the advice of Hill. Detective Castelleon did not question appellant regarding the accuracy of the statement, nor did he independently ascertain its authenticity. Hill's purpose and actions in taking the statement also give cause for suspecting its reliability. Under these circumstances, no proper predicate was laid for the admission of appellant's statement.

■ Additionally, the statement was inadmissible because it was obtained in violation of Art. 38.10, V.A.C.C.P., which protects the attorney-client privilege. Art. 38.-23, V.A.C.C.P. Article 38.10 provides, in pertinent part, that: ". . . an attorney at law shall not disclose a communication made to him by his client during the existence of that relationship, nor disclose any other fact which came to the knowledge of such attorney by reason of such relationship . . ." By giving the statement to the police, attorney Hill disclosed the contents of communications confidentially made to him by appellant during the existence of their attorney-client relationship. These communications did not relate to the commission of future crimes and the client did not knowingly consent to disclosure; the attorney was not excused from his duty to preserve the confidences of his client. See State Bar of Texas, Rules and Code of Professional Responsibility, DR 4–101(B), EC 4–1, EC 4–5 (1971).

■ It is clear from the language of Article 38.10 that the privilege protected is personal to the client and cannot be waived solely by the attorney. The application of that view to this case is consistent with the chief purpose of the privilege, which is the promotion of communication between attorney and client unrestrained by fear that these confidences may later be revealed. See *West v. Solito,* 563 S.W.2d 240, 245 (Tex.1978). Nor can it be said that appellant, by signing the statement after it was given to the police, had waived a privilege so vitally important to him in this case. Waiver will not be "lightly inferred" and this act alone, done by appellant at the behest of attorney Hill, fails to show either an intention by appellant to waive his rights or a sufficient awareness of the nature and significance of his conduct.[1] *Parker v. State,* 545 S.W.2d 151 (Tex.Cr.App. 1977); see Dix, Waiver in Criminal Procedure: A Brief for More Careful Analysis, 55 Tex.L.Rev. 193, 219–36 (1977). The record

---

1. The State suggests in its brief that appellant also knowingly consented to Hill's delivery of the statement to the police. The record does not support this assertion. At the initial 1974 hearing on the motion to suppress, Judge Archie Brown questioned Hill on this issue:

   "THE COURT: And he was talking to you in the relationship of attorney and client, was he not?

   "A. Absolutely.

   "THE COURT: And you didn't ask him— you didn't tell him in advance that you were going to disclose this to anyone?

   "A. He knew, when we left, that I was going to give a copy of the statement to Homicide.

   "THE COURT: That was after the statement was taken?

   "A. Right."

   \* \* \* \* \* \*

   "THE COURT: At the time he signed it and swore to it, you had not told him it was going to do anything but stay in your file?

   "A. That is correct."

   Hill's other testimony at this hearing was consistent with this colloquy, justifying Judge Brown's conclusion that: "[t]here is not one iota of proof as to any waiver of the attorney-client relationship." Moreover, Hill's testimony in the second, decisive, hearing on the motion to suppress remained totally consistent with this account. In overruling the motion to suppress, Judge Garcia made a factual finding that appellant knew Hill intended to give the statement to the police. This finding was correct; but this knowledge was gained after the statement had already been prepared, and appellant's silent, unavoidable acquiescence to Hill's decision will not support a legal conclusion that this conduct was a knowing consent to waiver. See, e. g., *Carnley v. Cochran,* 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962); *Baker v. State,* 519 S.W.2d 648 (Tex.Cr.App. 1975).

further indicates that appellant's actions were unacceptably influenced by the role Hill played in the totality of the circumstances. See *Paprskar v. State,* 484 S.W.2d 731 (Tex.Cr.App.1972); see also *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954).

For the reasons stated, the judgment is reversed and the cause remanded.