Linda May BURNETT

v.

The STATE of Texas, Appellee.

No. 65324.

Court of Criminal Appeals of Texas, En Banc.

Oct. 27, 1982.

Rehearing Denied Jan. 5, 1983.

---

Joseph C. Hawthorn, court appointed on appeal only, Beaumont, for appellant.

James S. McGrath, Dist. Atty., and John R. DeWitt, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

This is an automatic appeal[1] from a conviction for capital murder[2] in which the punishment assessed is death.

1. See Article 37.071(f), V.A.C.C.P.

2. V.T.C.A. Penal Code, § 19.03, provides in part relevant to this case:

The sufficiency of the evidence is not challenged, and, because they are unnecessary to our disposition of appellant's fifth ground of error, the facts constituting the offense need not be recited. We are constrained to reverse.

By her fifth ground of error, appellant contends the trial court erred by admitting a tape recorded conversation between her and James Michael Boulch, a hypnotist hired by her attorneys, over her objection that such admission was in violation of the attorney-client privilege and Article 38.10, V.A.C.C.P.[3]

Though much of the testimony adduced upon this issue conflicts, a few things, to which we now advert, are clearly established. Appellant hired attorneys Bill Howell and Helmutt Erwing to represent her in the defense of this cause on or about October 15, 1978. Thereafter, Joe Clark, an investigator in the employ of Howell and Erwing approached James Michael Boulch about hypnotizing appellant. Clark explained that appellant's attorneys were interested in a hypnotic interview in order to refresh the memory of the client, to give them better details as to the circumstances of the offense and, specifically, to see if she could recall if there had been witnesses at the scene.

All witnesses[4] testified it was their understandings from the beginning, that Boulch's interview with appellant was for the purpose of assisting her attorneys in the preparation of her defense. All agreed that any communications to be made would be confidential.

On the morning of November 14, 1978, Boulch arrived at Howell's law offices where the interview took place through the day. Boulch testified he first conducted a "rapport building" interview with appellant, in which she related what she could recall about the offense.[5] The evidence conflicts as to how much time was spent in this endeavor, when the tape recorder was stopped and started, and exactly who was present when;[6] but plainly, attorney Erwing was present through the entire interview between Boulch and appellant, conducted while the latter was under hypnosis, and also participated in the questioning. All also agree that, as Boulch prepared to depart, he was asked by Erwing or Howell to leave the tape.

According to Howell, Erwing and appellant, Boulch explained that he had brought a reel to reel tape recorder in order to tape the six or seven hour interview on a slow speed; this had avoided interruptions in taping. The attorneys agreed they only had cassette equipment and would be unable to use the large reel. Boulch told them he would re-record the interview on a cassette and turn it over to them. Howell and Erwing testified it was their understanding that Boulch would also at that time give them the original. Boulch was in a great hurry, so Howell and Erwing allowed him to leave with the tape.

"(a) A person commits an offense if he [intentionally or knowingly causes the death of an individual] under Section 19.02(a)(1) of this code and:

\* \* \* \* \* \*

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping...."

3. Article 38.10, V.A.C.C.P. provides:
 "All other persons, except those enumerated in Articles 38.06, 38.101, and 38.11, whatever may be the relationship between the defendant and witness, are competent to testify, except that an attorney at law shall not disclose a communication made to him by his client during the existence of that relationship, nor disclose any other fact which came to the knowledge of such attorney by reason of such relationship."

4. Those witnesses being attorneys Erwing and Howell, Boulch, and, of course, Linda May Burnett.

5. Boulch explained the purpose of this "rapport building session" was to offer a comparison between appellant's memory without, then with, the aid of hypnosis.

6. Attorneys Howell and Erwing, appellant and Boulch were present in varying combinations during the first couple of hours.

Boulch testified he was not in a hurry and had already told Howell and Erwing the original tape would be his.

All agree nevertheless that Erwing called Boulch within the next couple of days solely to inquire as to whether the tape was safe. Further, when Joe Clark went by Boulch's office a few days later to re-record the interview on a cassette, he also asked for the original tape. Boulch explained to Clark that he would have to keep the original.

The record establishes that on November 29, 1978, Boulch was served with a writ of attachment ordering his appearance before the Jefferson County Grand Jury on the next day, and his production at that time of the tape containing Boulch's interview with appellant conducted November 14. The grand jury thereafter returned a new indictment against appellant.

At trial, the State sought to introduce a portion of the tape as State's Exhibit No. 126.[7] In the hearing conducted outside the jury's presence, appellant testified she would not have submitted to the interview with Boulch but for her understanding that, as agent of her attorneys, Boulch was constrained by the same terms of confidentiality as they. She further testified that she had never given anyone permission to disseminate or otherwise disclose any part of her November 14 conversation with Boulch. Neither had appellant given permission that a written transcript be made from the tape. She claimed the attorney-client privilege as to the entire conversation.

The trial court nevertheless admitted the "pre-hypnotic" portion of the tape into evidence.

7. That portion was the "rapport building," prehypnotic interview.

8. And axiomatic in the constitutional proposition that "defendants facing felony charges are entitled to the effective assistance of competent counsel," *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970), is the very practical consideration that the criminal defense lawyer controls the progress of a case—including the employment of investigators or other agents—while the client con-

## I. *The Privilege*

In Texas the privilege as to communications between attorney and client extends to "persons who are the media of communication between him and the client," 61 Tex.Jur.2d 671, Witnesses, § 106; *Morton v. Smith,* 44 S.W. 683, 684 (Tex.Civ. App.1898). Since at least 1885 the privilege has been held to include "a witness or friend who acted with the attorney for his client," *Rosebud v. State,* 50 Tex.Cr.R. 475, 98 S.W. 858, 859 (1906), following *Hernandez v. State,* 18 Tex.App. 134, 152–154, 51 Am.Rep. 295 (Ct.App.1885).[8]

The State would have us conclude the communications contained on the tape are not privileged, pointing to suggestions contained in the record that the "purpose" of the interview was other than to assist appellant's attorneys in preparation of her defense. The State argues we should defer to the trial court's determination since the mentioned suggestions raise an issue of fact. But regardless of the *purpose* of the session with Boulch asserted by the State after the fact, the *function* of such a recorded interview with an accused pretrial is self-evident. And neither of the *purposes* asserted by the State to have joined a fact issue is inconsistent with the *function* of testing the recall of appellant under hypnosis.

Whatever appellant's lawyers had in mind when the session was arranged, introducing its fruits in evidence at trial could hardly have been a feasible idea. Hypnotic evidence is generally not admissible at a criminal trial, *Greenfield v. Commonwealth,* 214 Va. 710, 204 S.E.2d 414 (1974), and related Annotation, 92 ALR3d 442, and counsel is charged with that knowledge of

fronts only three personal decisions: his plea to the charge, whether to be tried by a jury and whether to testify in his own behalf. See view of the Chief Justice when in 1969, as a United States Circuit Judge, he discussed the respective roles of the accused and his counsel at 5 CrL 2161, 2162; *Sapata v. State,* 574 S.W.2d 770, 771 (Tex.Cr.App.1978); see also *King v. State,* 631 S.W.2d 486, 501, n. 29 (Tex.Cr.App. 1982); and State Bar of Texas, Rules and Code of Professional Responsibility, EC 7–7 (1972).

the law. See *McMann v. Richardson,* supra, 397 U.S. at 771, 90 S.Ct. at 1449. From its reading of *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981), the State informs us that acceptable practice prior to actual hypnosis features a recitation by the subject of a detailed account of the facts as they are recalled, exclusion of all but hypnotist and subject from the session, and making a recording of it.

 Because it appears from the facts that the hypnotist hired by defense counsel here followed substantially the accepted practice, appellant's attorneys no doubt anticipated that what the State calls the "prehypnotic interview," would take place and be recorded. Since that interview preceded hypnosis, the dialogue between Boulch and appellant was not, therefore, inflicted with revealed frailties of hypnotic evidence.[9] Thus, the parties offer various characterizations of the tape recording of the interview that went on before actual hypnosis—work product of defense counsel, personal proper-

ty of the hypnotist and the like—but when all is said and done, the tape recording, as with deeds, notes, vouchers, documents and papers of a client, is the property of *appellant.*[10] This is so because, although it is clear Boulch was acting as "agent" of her counsel, the unique services he rendered were on behalf of appellant.[11] Therefore, the attorney-client privilege extended to the "pre-hypnotic" interview with Boulch, and the tape recording of it. *People v. Goldbach,* 27 Cal.App.3d 563, 103 Cal.Rptr. 800 (1972).[12]

The tape recording Boulch was compelled by grand jury subpoena to produce was obviously incriminatory of appellant. Had the prehypnotic interview been held and recorded on her own initiative, rather than being arranged by her attorneys, the question would be whether the tape recording in *her hands* would be privileged from compelled production by the safeguards of the Fifth Amendment and of Article I, § 10 of our Bill of Rights against selfincrimina-

---

9. "Most experts agree that hypnotic evidence is unreliable because a person under hypnosis can manufacture or invent false statements. [citing authorities] A person under a hypnotic trance is also subject to heightened suggestibility. McCormick, Law of Evidence, § 208 at 510 [2nd ed. 1972]," *Greenfield v. Commonwealth,* supra, 92 ALR3d at 439. See also *People v. Shirley,* 31 Cal.3d 18, 181 Cal.Rptr. 243, 641 P.2d 775 (Cal.Sup.Ct.1982) in which it was observed: "Beyond any doubt ... at the present time the use of hypnosis to restore the memory of a potential witness is not generally accepted as reliable by the relevant scientific community."

10. Thus, Disciplinary Rule 2–110(A)(2) directs the lawyer who withdraws from employment to deliver "to the client all papers and property to which the client is entitled;" Ethical Consideration 4–6 contemplates that a lawyer who terminates his practice "might provide for the personal papers of the client to be returned to him." While in his possession, however, the practicing lawyer has a passive common law lien on papers and other property of the client, but he may not sell to foreclose his lien since it extends only to the right to retain property of the client until the debt is paid. *Thomson v. Findlater Hardware Co.,* 156 S.W. 301, 303 (Tex.Civ.App.—Austin, 1913) and on certified question, 109 Tex. 235, 205 S.W. 831, 832 (1918), quoting approvingly from Mechem on Agency: "An attorney has a general lien upon

all the papers, deeds, vouchers, and other documents of his client, which come into the possession of the attorney while he is acting for his client in a professional capacity. * * *"

11. The dissenting opinion cites Wigmore on Evidence, § 2301, but it turns the meaning of what the treatise actually states. Thus, the dissent would have it that the privilege "protects communications to the attorney's agents who are indispensable to *the communication* between the attorney and client," whereas Wigmore says, "The *assistance of these agents being indispensable* to his work and the communications of the client being often necessarily committed to them by the attorney or by the client himself, the privilege must include all the persons who act as the attorney's agents." (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

12. The privilege attaches to confidential communications made by an accused to a psychiatrist serving as consultant to defense counsel. On the civil side in Texas, even a statement made by a person to a claims adjuster for his insurance company, meant to be delivered to its attorney, is privileged. *Gass v. Baggerly,* 332 S.W.2d 426, 430 (Tex.Civ.App.—Dallas 1960).

tion.[13] If she thereafter placed the recording in the hands of her attorneys, it is whether *they* could be required to produce it. *Fisher v. United States,* supra, U.S. at 404, 96 S.Ct. at 1577.[14] Here, however, her statements in the interview with Boulch were made as a communication for her attorneys, and as such "is not to be produced, whether it was made by the client by word of mouth or by writing," 8 Wigmore, op. cit., supra, § 2307, p. 594: "Since a document which is itself a communication is within the privilege, the test is whether the document first came into existence as a part of a communication to the attorney." The conclusion is inescapable that the recording was protected from production ordered by grand jury subpoena directed to Boulch—made by him as agent for her attorneys. *Id.,* at 595.

## II. *Waiver of the Privilege*

■ The law is "perfectly plain that the waiver [of the client-attorney privilege], like the privilege, belongs solely to the client, and not to the attorney." 8 Wigmore (McNaughton Revision) § 2327. "Since . . . it is the client who is the holder of the privilege, the power to waive it is his, and he alone, or his attorney or agent *acting with his authority,* may exercise this power." E. Cleary, *McCormick's Handbook of the Law of Evidence* 194 (2d ed. 1972).

In *Cruz v. State,* 586 S.W.2d 861, 865 (Tex. Cr.App.1979), Judge Dally, speaking for a unanimous Court, reasoned thus:

"It is clear from the language of Article 38.10 that the privilege protected is personal to the client and cannot be waived solely by the attorney. The application of that view to this case is consistent with the chief purpose of the privilege, which is the promotion of communication between attorney and client unrestrained by fear that these confidences may later be revealed. * * * Nor can it be said that appellant by signing the statement after it was given to the police, had waived a privilege so vitally important to him in this case. Waiver will not be 'lightly inferred' and this act alone, done by appellant at the behest of attorney Hill, fails to show either an intention, by appellant to waive his rights or a significant awareness of the nature and significance of his conduct."

■ We therefore cannot agree with the State that the defense attorneys' "disclosure" of the tape to two investigators waived the privilege; [15] there is no suggestion in the record before us that this was authorized by Linda May Burnett, their client. Even if appellant had authorized the disclosure of the tape to an investigator,

13. See *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976): "It is also clear that the Fifth Amendment . . . applies only when the accused is compelled to make a *testimonial* communication that is incriminating," *id.,* at 408, 96 S.Ct. at 1579 (original emphasis), and as "private papers" the holding of *Boyd v. United States,* 116 U.S. 616, 634–635, 6 S.Ct. 524, 534–535, 29 L.Ed. 746 (1886); that would bear on whether appellant could be compelled to produce the tape recording. *Fisher v. United States,* supra, U.S. at 414, 96 S.Ct. at 1582.

14. The rule is excerpted from 8 Wigmore (McNaughton Revision) § 2307, p. 592, *viz:* "It follows, then, that *when the client himself would be privileged* from production of the document, either as a party at common law . . . or as exempt from self-incrimination, the attorney having possession of the document is not bound to produce." (original emphasis)

15. The dissent points to the fact that attorney Erwing admitted turning his cassette copy of

the tape over to David Lee Salmon, an investigator, so that it could be tested and transcribed. What is deleted, however, is the fact that this occurred *after* the privilege had been violated by Boulch's forced production of the original before the grand jury; thus, the original tape was in the possession of the prosecutors at that time. And during the suppression hearing, the trial court agreed with defense counsel that the State's repeated refusal to produce the tape on the defense's request, had been in violation of *his* discovery order.

Clearly then, the only way for the defense to determine the content of the tape, was to have an expert transcribe the cassette copy which was described by all asked to do so, as "mangled" and of such "poor quality" as to be unintelligible to an untrained ear.

The other investigator referenced is Joe Clark, who plainly had been assisting counsel in preparing appellant's defense from the beginning.

it still would have been privileged. *Goldstein v. Great A & P Tea Co.,* 118 So.2d 253 (Fla.App.1960). This is because "the privilege must include all the persons who act as the attorney's agents." Wigmore, supra, at § 2301. The privilege extends to communications between the lawyer and "one employed by the lawyer to assist the lawyer in the rendition of professional legal services." Uniform Rule of Evidence 502.

Accordingly, appellant's claim of privilege before the trial court was good and valid, and the judgment of conviction must be reversed and the cause remanded.

It is so ordered.

DALLY, Judge, dissenting.

I prepared the following opinion which was rejected by the majority. I now offer it to serve as my dissent. Each ground of error has been examined, and I believe the conviction should be affirmed.

The appellant in ten grounds of error asserts that the trial court erred: by overruling her motion for change of venue, by overruling her challenge of a prospective juror, by admitting a tape recording in evidence, and by erroneously charging the jury. Each of the appellant's grounds of error should be overruled and the judgment affirmed.

The sufficiency of the evidence to sustain the conviction is not challenged; however, a brief summary of the facts will help in understanding the discussion of the grounds of error.

Joe Dugas and appellant agreed in May of 1978 to help each other kill Dugas' in-laws (Bishop Neil Phillips and Esther Viola Phillips) and appellant's former husband (Hubert Miller). Together they planned a beach trip alibi and prepared for the murder of Dugas' in-laws by securing necessary weapons and materials and by digging a large grave in which the bodies would be buried. On July 1, 1978, appellant and Dugas drove his car to a prearranged site, where they left his car and drove her car to the Phillips' home. Appellant and Dugas entered the home by cutting through the front screen door. They held the Phillips family (Mr. and Mrs. Phillips, their son, his wife and child) at gunpoint, ordered them into the son's car, and drove to the pre-dug grave. Appellant shot and killed the adult members of the family and Dugas shot and killed the baby. Appellant and Dugas then disposed of the weapons and materials used and covered the grave. Dugas returned to the car the next day and burned it.

On July 3, 1978, Joe Dugas told his brother Richard that he had killed five people; the next day Joe told Richard he thought he had committed the perfect murder, and related the details and the contrived alibi. On July 7, 1978, Richard Dugas told the Vidor police the story related to him by Joe. Appellant was arrested three days later. She soon retained an attorney but then released him and hired attorneys Bill Howell and Helmutt Erwing.

On November 14, 1978, the appellant and her attorneys met with James Michael Boulch, a hypnotist. The purpose of this meeting was to hypnotize appellant and have her describe under hypnosis her involvement in the murders. A pre-hypnotic interview and a hypnosis session were both tape recorded. The tape recording of the pre-hynotic interview was admitted in evidence and the admission of the tape at trial is the subject of several of appellant's grounds of error.

The appellant says the trial court abused its discretion in failing to grant her motion for a change of venue in which she alleged she could not get a fair trial because of the extensive media coverage of the crimes. The evidence heard by the trial judge on the appellant's motion for a change of venue, which was controverted by the State, was in conflict; this evidence raised an issue of whether the appellant's trial in Jefferson County would be fair and impartial. The issue was decided against the appellant when the trial judge, as the trier of facts on the issue, overruled the motion for change of venue. The role of this Court then is to review the court's ruling to determine whether there was an abuse of discretion, *Barefoot v. State,* 596 S.W.2d 875

(Tex.Cr.App.1980); *Von Byrd v. State,* 569 S.W.2d 883 (Tex.Cr.App.1978); *Freeman v. State,* 556 S.W.2d 287 (Tex.Cr.App.1977), and review the record to determine whether the appellant received a fair and impartial trial. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

Jefferson County had a population of 264,283 and there was a jury pool of 113,-768. The hearing on the change of venue was seven months after the commission of the offense. There was extensive coverage of the murders by the media; in 1978, in Jefferson County the top news stories concerned with crime were the accounts of these murders and the investigation by law enforcement officers. The media accounts appear to be objective, factual accounts, without editorial overtones.

A number of witnesses testified that in their opinion the appellant could not obtain a fair and impartial trial in Jefferson County; however, a number of witnesses testified that in their opinion the appellant could obtain a fair and impartial trial in Jefferson County. The trial judge in overruling the appellant's motion for change of venue stated that he would consider the question during the jury voir dire and would order a change of venue if it appeared necessary.

Many prospective jurors and all but one of the jurors who served had heard or read about the case, but all of the jurors selected to serve testified they could be fair and impartial and would render a verdict solely on the evidence presented in court.

Although many people attended the trial, the record reflects that the trial judge exercised proper control of the people in the courtroom. When the seats in the courtroom were filled, the trial judge would not allow other people to stand in the courtroom. He made special provisions for seating members of the appellant's family who were in attendance at the trial.

The trial court did not abuse its discretion in overruling the motion for change of venue and the record shows that the refusal to grant a change of venue did not deprive appellant of a fair and impartial trial.

The appellant argues that venireman Earl Howard Hensley's voir dire responses show that he was unable to consider imposing any other punishment except the death penalty for capital murder and that he should have been excused for cause. The appellant exercised a peremptory strike on venireman Hensley after her challenge for cause was overruled. After she exhausted her peremptory challenges and her request for additional peremptory strikes was denied, she alleges she was forced to accept two jurors who were objectionable to her. The alleged error was preserved for review. *Cuevas v. State,* 575 S.W.2d 543 (Tex.Cr.App.1978); *Hernandez v. State,* 563 S.W.2d 947 (Tex.Cr.App.1978); *Wolfe v. State,* 147 Tex.Cr.R. 62, 178 S.W.2d 274 (1944).

The appellant argues that venireman Hensley should have been excluded for cause under Art. 35.16(c)(2), V.A.C.C.P., which provides in pertinent part:

"(c) A challenge for cause may be made by the defense for any of the following reasons:

"(1) . . . .

"(2) That he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the *punishment therefor.*" [Emphasis supplied.]

A defendant is entitled to be tried by jurors who believe in the full range of punishment. *Woodkins v. State,* 542 S.W.2d 855 (Tex.Cr.App.1976); *Pierce v. State,* 604 S.W.2d 185 (Tex.Cr.App.1980); *Cuevas v. State,* supra; *Smith v. State,* 573 S.W.2d 763 (Tex.Cr.App.1977). When a venireman's voir dire responses show that he holds strong convictions that death is the only punishment he would consider for a person guilty of capital murder, the defend-

ant's challenge for cause should be granted by the trial court. *Smith v. State,* supra; *Pierce v. State,* supra. Defendant's challenge for cause of a prospective juror who states he would consider life imprisonment as a punishment for capital murder only if the evidence shows the defendant to be insane similarly should be granted by the court. *Cuevas v. State,* supra.

The appellant contends that venireman Hensley's voir dire examination reveals that he did not believe in the full range of punishment because he was unable to consider any penalty but death for a defendant convicted of capital murder, and urges that reversal is therefore required under *Cuevas v. State,* supra; *Smith v. State,* supra, and *Pierce v. State,* supra.

After carefully reviewing the whole of venireman Hensley's voir dire examination, I do not find that he indicated the type of firm belief that death was the only appropriate punishment for capital murder which made the prospective jurors in *Smith, Cuevas,* and *Pierce* unacceptable. Venireman Hensley's responses are ambiguous, contradictory, and confused. During the defense attorney's examination of Hensley, he stated that he would be compelled to assess a penalty of death if he found the defendant guilty of capital murder. When asked if he could conceive of any circumstances under which he would assess a sentence of life imprisonment, he first replied that he did not know, and then replied, "No." Hensley also at that time stated that he could not conveive of any circumstances under which he would assess a sentence of life imprisonment for a conviction of capital murder.

The appellant then challenged the venireman for cause, and the court allowed the State to further question the venireman as follows before ruling on the challenges:

"Q. Now, my question to you is: If you found a Defendant guilty of Murder during the course of a kidnapping or a burglary—Let's assume you found that person guilty of capital murder.

"A. Yes, sir.

"Q. Could you, as a juror, whether you heard evidence at the punishment phase of the trial, or didn't hear any evidence at the punishment phase of the trial—whichever way it is—if you felt like the State had not proved to you beyond a reasonable doubt that the Defendant did it deliberately, would you write a 'No' answer?

"A. Yes, sir, I would.

"Q. Knowing that writing a 'No' answer would cause the Defendant to be assessed a punishment of life?

"A. Yes, sir.

"Q. If you believed that after you found any Defendant guilty of Capital Murder . . . if you believed that the State had failed to prove that to you beyond a reasonable doubt, would you answer Question Two, 'No'?

"A. Yes, sir, I would.

\* \* \* \* \* \*

"Q. So, that's all I want to be sure of is that you will follow the evidence and base your verdict on the evidence. If you believe the answer should be 'Yes' from the evidence, whether it came from the guilt or innocence or the punishment you would answer it 'Yes'?

"A. Yes, sir.

"Q. If you believe the answer was 'No', then whatever the evidence was, if you believed the answer was 'No', you would follow the evidence and answer the question, 'No', is that correct or not?

"A. I think I would."

The trial court denied the challenge for cause, but allowed the defense attorney to further examine the venireman:

"Q. . . . You could as a juror in the punishment phase of the hearing, possibly assess a life sentence even though you found her guilty of Capital Murder?

"A. Yes, sir, I could. I mean, I'm capable of doing it, but I didn't say I would do it.

"Q. Right. Would you say you really don't have the willingness to do it? Is that a problem with you, willingness rather than capability?

"A. Repeat the question.

"Q. Would it be fair for me to say, Mr. Hensley, that you have got the kind of feelings about this situation with Mrs. Burnett, that if you did find her guilty, as a juror along with other jurors, of Capital Murder, you would not want to give her life imprisonment? Would that be more your position on it? In other words, you could mentally, but you couldn't with your heart; would that be fair to say?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Briefly, Mr. Hensley, on range of punishment, can you consider anywhere from probation to life imprisonment for just plain Murder? Can you consider that range of punishment—punishment for plain Murder?

"A. Yes, sir.

"Q. All right. Can you consider under any circumstances the same punishment of life imprisonment for Capital Murder, under any circumstances?

"A. Yes, sir, I think I could consider it."

Reviewing Hensley's voir dire examination as a whole, it cannot be concluded that the trial court erred in overruling appellant's challenge for cause of venireman Hensley. His voir dire responses do not indicate an inability to consider the full range of punishment for capital murder. This ground of error should be overruled.

Next, the appellant asserts that the trial court erred by admitting, over her objection, the statements made by Joe Dugas to Richard Dugas on July 4 because these statements were hearsay. Richard Dugas was permitted to relate the statements made to him by Joe Dugas which implicated appellant in the murders.

When there is sufficient independent evidence to establish a conspiracy, hearsay statements of a co-conspirator which are made prior to the time the object of the conspiracy is completed are admissible. *May v. State,* 618 S.W.2d 333 (Tex.Cr.App. 1981); *Denney v. State,* 558 S.W.2d 467 (Tex.Cr.App.1977). They are admissible even though made after the murder was committed. *May v. State,* supra.

Independent evidence in the instant case is quite sufficient to establish the existence of a conspiracy between the appellant and Dugas. The testimony of witness Neel established that the appellant and Joe Dugas together solicited his (Neel's) assistance in the murders. The existence and nature of the conspiracy was also established by the tape recording of appellant's pre-hypnotic interview which was admitted in evidence.

The appellant argues, however, that the statements made to Richard Dugas were made after the conspiracy had terminated and that they were therefore inadmissible as hearsay. "A conspiracy is not finally terminated until everything has been done that was contemplated to be done by the conspirators." *Robins v. State,* 134 Tex. Cr.R. 617, 117 S.W.2d 82 (1938).

The conspiracy in this case was not terminated on completion of the murder of the Phillips family. The murder of the appellant's former husband and a beach trip alibi were explicitly planned by the appellant and Joe Dugas. Also, the disposal of the weapons used in murdering the Phillips family was an integral part of the conspiracy. Joe Dugas' statements to Richard were made before there was any evidence to show the conspirators had either abandoned the plan or attempted to kill appellant's former husband. The beach trip alibi was still being told, and Joe Dugas after his arrest on July 7, through a telephone call to his mother instructed his brothers to remove from his house weapons including a K-bar knife and a .45 caliber pistol used [as a bludgeon] when the Phillips family was kidnapped and killed. The conspiracy had not terminated when Joe Dugas made the statements to his brother Richard on July 3rd and 4th.

The appellant insists Joe Dugas' statements to Richard were not admissible because they were not made in furtherance of the conspiracy. There is divided authority on the admissibility of a co-conspirator's statement whether it must be in the furtherance of the conspiracy or only related to the conspiracy. See Federal Rules of Evidence, Rule 801; Model Code of Evidence, Rule 63(9). The rule generally stated is: the acts and declarations of a co-conspirator, must occur during the conspiracy, and be in furtherance of the conspiracy. This rule is recited especially in earlier cases in this jurisdiction. See, e.g. *McKenzie v. State,* 32 Tex.Cr.R. 568, 25 S.W. 426 (1894); *Elliot v. State,* 111 Tex.Cr.R. 534, 15 S.W.2d 648 (1929); and *Morphey v. State,* 119 Tex.Cr.R. 77, 45 S.W.2d 1099 (1932). However, later cases hold that the statement need only be related to the conspiracy. See *Delgado v. State,* 544 S.W.2d 929 (Tex. Cr.App.1977); *White v. State,* 451 S.W.2d 497 (Tex.Cr.App.1969); and *Morgan v. State,* 519 S.W.2d 449 (Tex.Cr.App.1975). However, as the facts appear in the record, the decision here need not reconcile these differences, since the conversations were made in furtherance of the conspiracy.

The .22 caliber rifle used to kill the Phillips family was a weapon which Joe Dugas had borrowed from his brother Richard. In the July 3rd conversation Joe said he had killed five people; he had dismantled the rifle and thrown the pieces away so he paid Richard $40 for the rifle. This conversation and this transaction were unquestionably in furtherance of the conspiracy and admissible. *Helms v. State,* 493 S.W.2d 227 (Tex. Cr.App.1973); *Denny v. State,* supra.

In his July 4th conversation with Richard, Joe said a woman, whom he did not name, had helped him murder the Phillips family. During this conversation Joe Dugas explained the beach alibi he and appellant had contrived. This rendering of the alibi to Richard Dugas was made in furtherance of the conspiracy. It was necessary to the concealment of the crime that Richard Dugas be aware of the crime and of the alibi that Joe and appellant would tell "in case anyone asks." The conversation of July 4th, being in the furtherance of the conspiracy was not inadmissible hearsay but was properly admitted in evidence.

In five grounds of error the appellant declares that the tape recording of her prehypnotic interview was erroneously admitted in evidence. She urges that the tape recording was erroneously admitted because: a proper predicate for its admission was not laid, its admission violated the attorney-client privilege, its admission violated an attorney work product doctrine. It is also urged that the tape recording was inadmissible because it had been altered and because it was made as a result of ineffective assistance of counsel.

In *Edwards v. State,* 551 S.W.2d 731 (Tex.Cr.App.1977), requirements said to be necessary to lay a proper foundation for the admission of a sound recording in a criminal trial were set out. Those requirements are: (1) a showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of the authenticity and correctness of the recording, (4) a showing that changes, additions, or deletions have not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers, and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement.

Boulch testified that he had listened to the tape recording and found it accurately presented the interview as he remembered it. Thus the first three requirements are satisfied. Boulch's testimony establishes the authenticity of the tape. The voluntary nature of the interview can be inferred from the testimony; there is no indication that appellant was induced by her attorneys against her will to participate in the interview. Calise Blanchard, an investigator for the Jefferson County District Attorney's Office, testified he listened to the tape shortly after it was subpoenaed and shortly before it was offered in evidence; it was the same on both occasions. Although controverting testimony of experts was of-

fered, Boulch's and Blanchard's testimony together established the fact that the tape had not been tampered with and that it had been properly preserved while in possession of the State. The testimony of Boulch and appellant's attorneys established the identity of the speakers as the appellant and Boulch. The trial judge ruled correctly that a proper predicate had been laid.

The appellant contends that the admission into evidence of the tape recorded conversation between appellant and Boulch violated appellant's attorney-client privilege. Art. 38.10, V.A.C.C.P. The tape recording had been made prior to and during hypnosis of appellant by Boulch, and it was obtained from Boulch by grand jury subpoena. The State offered into evidence only that part of the tape recording made prior to hypnosis.

Appellant argues that the communications between herself and Boulch were privileged since Boulch was an "agent"—a necessary medium of communication—of the defense attorneys.

The attorney-client privilege is summarized by Wigmore as follows:

"(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that person, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived."

The privilege in Texas has been embodied in Art. 38.10, V.A.C.C.P. which reads in pertinent part:

". . . an attorney at law shall not disclose a communication made to him by his client during the existence of that relationship, nor disclose any other fact which came to the knowledge of such attorney by reason of such relationship."

The privilege also protects communications to the attorney's agents who are indispensible to the communication between the attorney and client. Wigmore, Evidence, supra, Sec. 2301; *United States v. Pipkins,* 528 F.2d 559 (5th Cir.1976), cert. denied, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191. However, when the client departs from the purpose of seeking legal advice, the privilege will not protect him, and circumstances which indicate that the communication is not confidential will negate the privilege. *Ballard v. Ballard,* 296 S.W.2d 811 (Tex.Civ. App.—Galveston, 1956); *Johnson v. State,* 76 Tex.Cr.R. 346, 174 S.W. 1047 (1915).

At appellant's hearing on her pretrial motion to suppress the tape recording, a fact issue was raised as to the *purpose* of the hypnosis. Deborah Jackson, a cell mate of appellant, testified that "she [appellant] said the reason for making the tapes was to alleviate the depression she had at the time," and the District Attorney James S. McGrath testified that, in response to his [McGrath's] query as to the purpose of the hypnotic interview, defense counsel Howell stated that the defense team had publishing rights to appellant's story and the hypnosis would be useful in writing a book. Although appellant's trial attorneys and Boulch testified that the purpose of the hypnosis was to supplement the attorney's investigation, there was sufficient evidence for the trial court to find that the communication was not privileged because it was made for purposes other than appellant's defense. In the appellant's brief it is admitted: "There is some indication that the purpose [of the hypnotic interview] was to gather details about the offenses from Appellant for a book the attorneys were planning to write." The trial court's determination of the fact issue was within its discretion and should not be disturbed upon appeal. *Jackson v. State,* 516 S.W.2d 167 (Tex.Cr.App.1974); *Maldonado v. State,* 425 S.W.2d 646 (Tex.Cr.App.1968). The decision could rest on this basis.

However, assuming that the contents of the tape recording were in fact privileged communications between appellant and her attorneys, any protection afforded by the privilege was lost by the disclosure of the contents to certain third persons. Where the presence of a third person is necessary for communication to be made to the attorney, the policy of the privilege will protect

the client. 8 Wigmore on Evidence, supra, Sec. 2311, p. 602. Defense counsel Erwing testified that he delivered a copy of the taped conversation to David Lee Salmon, a private investigator, for Salmon to test and reproduce and for his secretary to transcribe. Although this may have saved the defense counsel the inconvenience of having the transcription done in their offices, it cannot be said that Salmon nor his associates were necessary media of communication between appellant and her attorneys. The contents of the tape were also revealed to an investigator, Joe Clark, who cannot be considered a necessary link in communication between appellant and her attorneys.

In an analogous case, *Himmelfarb v. United States,* 175 F.2d 924, cert. denied 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949) an accountant was employed directly by the attorney, the accountant's testimony and workpapers were held to be outside the attorney-client privilege. The accountant was present at meetings between the defendant and his attorney and was later called as a witness by the prosecutor. The testimony of the accountant was objected to by the defense on the ground that the accountant was an agent of the attorney and thus the communications between the attorney, accountant, and taxpayer were protected. The court held to the contrary, however, stating: "[The accountant's] presence was not indispensible in the sense that the presence of an attorney's secretary may be. It was a convenience which, unfortunately for the accused, served to remove the privileged character of whatever communications were made."

Before the tape was offered in evidence it had been exposed to Salmon, his associates, and Clark. The contents of the tape were thus revealed to numerous third persons who cannot be considered agents indispensible to the communication between appellant and her attorneys. If the communications on the tape were intended to be confidential, the necessary care to preserve their confidential nature was not taken. The lack of precaution, if not indicative of the original non-privileged status of the communication, later operated to destroy whatever privilege had once existed. Whatever the intended result was, the degree of disclosure reached that point where fairness would require that the privilege cease. The risk of insufficient precaution is upon the client. See 8 Wigmore, Evidence, Sec. 2327 (McNaughton rev. 1961); *In re Grand Jury Investigation of Ocean Transportation,* 604 F.2d 672 (1979). Persons who were not necessary media of communication between appellant and her attorneys were given access to the contents of the tape. Therefore the attorney-client privilege was waived. *Morton v. Smith,* 44 S.W. 683 (Tex.Civ.App. 1898).

The appellant's next contention that the admission of the taped interview violated the work product doctrine is similarly without merit. This mechanical tape recording of conversation is not a work product in the sense that notes and reports of geologists, accountants, or physicians are work products. The applicability of the work-product doctrine is generally limited to pretrial *discovery* procedures. In the instant case, the trial court ruled on the admissibility of the tape *at trial.* However, assuming the applicability of the work-product doctrine as it is here urged, the privilege afforded by the doctrine was waived. The disclosure of the tape's contents to certain third persons operated as a waiver of the work-product protection in the same manner as it constituted a waiver of the attorney-client privilege claimed by appellant.

The appellant's contention that her counsel were ineffective because they allowed the hypnotic interview is also without merit. Hypnotic interviews of witnesses may be legitimate in the investigation of some cases. The effectiveness of counsel is to be judged by the standard of "reasonably effective assistance." *Ex parte Duffy,* 607 S.W.2d 507 (Tex.Cr.App.1980). In applying this standard we must look to the totality of representation. See *Johnson v. State,* 614 S.W.2d 148 (Tex.Cr.App.1981); *Ex parte Prior,* 540 S.W.2d 723 (Tex.Cr.App. 1976). The overall record shows that the totality of representation rendered by appellant's trial counsel was adequate to meet

constitutional standards as applied by the Supreme Court and by this Court.

The appellant also contends that the trial court's charge erroneously authorized the jury to convict her on a theory not alleged in the indictment; it was alleged she had "*intentionally* cause[d] the death of Jason Blair Phillips," while the charge, in the application of law to the facts, used the words "intentionally *or knowingly* caused the death of JASON BLAIR PHILLIPS." The appellant did not raise this objection in the trial court and is therefore not entitled to relief unless, as she now urges, the charge presents fundamental error. In making this determination, this court should review the charge as a whole. *Jackson v. State,* 591 S.W.2d 820 (Tex.Cr.App. 1979); *Daniel v. State,* 486 S.W.2d 944 (Tex. Cr.App.1972).

It has been held that a court's charge which permits conviction on proof less than that required by the allegations in the indictment, is fatally defective. *Cumbie v. State,* 578 S.W.2d 732 (Tex.Cr.App.1979). The trial court in the present case correctly instructed the jury in the abstract portion of the charge on the law of capital murder and murder. In the application of the law to the facts, the trial court instructed:

"[I]f you believe from the evidence beyond a reasonable doubt that ... the Defendant ... intentionally or knowingly caused the death of JASON BLAIR PHILLIPS, by shooting him with a gun, *and that the Murder was intentionally committed* in the course of committing or attempting to commit kidnapping, you shall find the Defendant guilty of the offense of Capital Murder." [Emphasis supplied.]

It is apparent that the charge as a whole does not authorize the jurors to convict the appellant of capital murder unless they found she had committed the murder intentionally, as alleged in the indictment. The rights of the accused were adequately protected in the charge; no fundamental error is presented. See *Jackson v. State,* 591 S.W.2d 820 (Tex.Cr.App.1979); *Plunkett v. State,* 580 S.W.2d 815 (Tex.Cr.App.1979).

The appellant argues that the charge, by omitting the kidnap victim's name, is fundamentally defective because: it omits an essential element alleged in the indictment; it authorizes a conviction on a theory not alleged in the indictment; and it enlarges upon the allegations in the indictment by allowing the jury to convict the appellant on a finding that she had committed the murder during the kidnapping or attempted kidnapping of any person.

The indictment alleges in pertinent part that on July 1, 1978, the appellant:

"did then and there intentionally cause the death of Jason Blair Phillips by shooting him with a gun, and that the said LINDA MAY BURNETT was then and there in the course of committing and attempting to commit the offense of kidnapping, upon and of the said Jason Blair Phillips."

The portion of the charge of which appellant complains states:

"Now, if you believe from the evidence beyond a reasonable doubt that in Jefferson County, Texas, on or about July 1, 1978, the Defendant LINDA MAY BURNETT, acting alone or as a party with JOE DUGAS, intentionally or knowingly caused the death of JASON BLAIR PHILLIPS by shooting him with a gun, and that the murder was intentionally committed in the course of committing or attempting to commit kidnapping, you shall find the Defendant guilty of the offense of Capital Murder."

The naming of the kidnap victim is not an essential element of the offense of capital murder committed in the course of committing or attempting to commit the offense of kidnapping. *Brasfield v. State,* 600 S.W.2d 288 (Tex.Cr.App.1980); *King v. State,* 594 S.W.2d 425 (Tex.Cr.App.1980). Therefore, the court in this case did not omit an essential element of the offense by failing to name the victim of the kidnapping in the charge.

The court's charge authorized conviction only on the theory that the murder was committed while in the course of committing the offense of kidnapping. V.T.C.A. Penal Code, Sec. 19.03(a)(2).

The appellant's contention that the charge is fundamentally defective because by omitting the name of the kidnap victim it enlarged on the allegations of the indictment is without merit for the reasons stated in *Sattiewhite v. State,* 600 S.W.2d 277 (Tex.Cr.App.1980) which follows:

"[W]here the charge of the court applying the law to the facts correctly requires the jury to find every essential element of the offense alleged in the indictment and comports with the legal theory presented by the State through evidence that proves every factual allegation made in the charging instrument, an accused who perceives some error of omission in failure of the charge to reflect one or more factual details averred must call the matter to the attention of the trial court pursuant to Articles 36.14, 36.15, or 36.16, V.A.C.C.P. for a determination of whether corrective action is appropriate, in order to preserve the point for review under a ground of error in his appellate brief. This is because *unless otherwise faulty,* the charge thus described does not present fundamental error."

600 S.W.2d at 285, 286. (Emphasis in original.) Applying this standard, the court held that since the indictment alleged and the proof showed that the defendant had engaged in conduct that constituted every essential element of aggravated robbery, and the charge required the jury to find every essential element of the offense of aggravated robbery consonant with the legal theory developed by the evidence, no fundamental error had been shown.

Applying standards of *Sattiewhite* to the case at bar, no fundamental error has been shown; the indictment alleged and the State proved that the appellant had committed every essential element of capital murder consistent with the theory alleged in the indictment and supported by the evidence. Under the facts of this case fundamental error is not presented. *Sattiewhite v. State,* supra; *Trostle v. State,* 588 S.W.2d 925 (Tex.Cr.App.1980); *Layman v. State,* 73 S.W.2d 97 (Tex.Cr.App.1934); see also *Turner v. State,* 462 S.W.2d 9 (Tex.Cr.

App.1969); *Thomas v. State,* 605 S.W.2d 290 (Tex.Cr.App.1980).

The judgment should be affirmed.

TOM G. DAVIS, W.C. DAVIS, McCORMICK, JJ., join in this dissent.